IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE

AT JACKSON

APRIL 1997 SESSION

FILED

August 13, 1998

Cecil Crowson, Jr.
Appellate Court Clerk

| | | |
|---|---|---|
| STATE OF TENNESSEE, | ) | |
| | ) | |
| Appellee, | ) | No. 02C01-9605-CR-00140 |
| | ) | |
| | ) | Shelby County |
| v. | ) | |
| | ) | Honorable Chris Craft, Judge |
| | ) | |
| ANTHONY E. RICHARDSON, | ) | (First degree murder) |
| | ) | |
| Appellant. | ) | |


For the Appellant:

Joseph S. Ozment
217 Exchange Avenue
Memphis, TN 38105

For the Appellee:

Charles W. Burson
Attorney General of Tennessee
         and
Deborah A. Tullis
Assistant Attorney General of Tennessee
450 James Robertson Parkway
Nashville, TN 37243-0493

John W. Pierotti, Jr.
District Attorney General
         and
Jerry R. Kitchen
Assistant District Attorney General
201 Poplar Avenue
Memphis, TN 38103


OPINION FILED:_____


AFFIRMED

Joseph M. Tipton
Judge

**O P I N I O N**

The defendant, Anthony E. Richardson, appeals as of right from his conviction by a jury in the Shelby County Criminal Court for first degree murder. The trial court sentenced the defendant to life imprisonment with the possibility of parole. On appeal, the defendant presents the following issues:

> (1) whether the evidence is sufficient to support the first degree murder conviction;

> (2) whether the trial court erred by not declaring a mistrial when the prosecutor made biblical references during his closing argument; and

> (3) whether the trial court properly charged the jury with the flight instruction.

We hold that the evidence is sufficient and that the trial court did not commit reversible error. We affirm the judgment of the trial court.

This case involves the June 1, 1994, shooting death of Terry Gilliard at the LeMoyne Gardens Apartments in Memphis, Tennessee. The victim was shot six times by two individuals. The defendant and Earline Jackson were charged with first degree murder. Before the defendant's trial, Earline Jackson pled guilty to shooting the victim, but the record does not reflect the particular offense to which she pled.

Robert Flynn, the victim's first cousin, testified that he saw the defendant and the victim arguing on the day of the shooting. Flynn stated that he could not hear what the two were arguing about. He testified that after the defendant and the victim stopped arguing, he and the victim walked away. Flynn testified that a few minutes later, they ran into the defendant. He said that the defendant and the victim started scuffling and swearing at each other for two or three minutes, but neither one hit the other. He testified that the defendant ran off, shouting that he would be back.

Mr. Flynn testified that he and the victim started walking to his house and went between two buildings. He said that the defendant jumped out with a gun. Flynn said that he and the victim ran in different directions and that the defendant chased the victim. Flynn testified that although he did not see the victim get shot, he saw the defendant point the gun at the victim and heard a shot fired.

Dorothy Jackson testified that she was sitting under a tree with Rose Smart, who is the defendant's aunt, and a woman named Linda. She said that Robert Flynn, the victim, Lee-Lee, who was a friend of the victim, and a young boy came by the tree. She said that Rose tried to play with the boy, but he did not want to play. Ms. Jackson testified that the victim said to the boy, "Tell that bitch don't play with you." She said that the defendant came to her defense and that the defendant argued with the victim. Ms. Jackson said that she told them not to argue and that Flynn, the victim, Lee-Lee, and the young boy went one way and the defendant went the other.

Ms. Jackson testified that the victim, Flynn, and Lee-Lee returned. She said that the victim asked Rose where the defendant was, but none of the women answered. She testified that she saw the victim go in the same direction that the defendant had gone earlier. She said that about five or ten minutes later, she saw the defendant running from the direction that the victim, Flynn, and Lee-Lee had gone. She said that a few minutes later, the defendant ran back, this time carrying a pistol. Ms. Jackson said that she heard several gunshots and that she and Linda took the children into the house.

Ms. Jackson testified that she went to where she heard the gunshots and that she saw the victim lying on the ground, bleeding. She said that as she went toward him, Earline Jackson came out and told Lee-Lee to get back. She testified that Earline Jackson fired one shot at the victim from behind a concrete wall, walked to within ten or

3

fifteen feet of him, and fired twice more. She said that by this time, Lee-Lee had walked away. She testified that neither the victim nor Lee-Lee had a gun but that when Flynn came back after the shooting, he had a gun.

Brenda Mack testified that she witnessed the shooting while she was leaning out her kitchen window. She said that she was speaking to Linda, who was on the grass below her second floor apartment. She testified that she saw the defendant shoot the victim once as the victim was running away from the defendant. She testified that after firing the first shot, the defendant ran away, came back and cursed the victim, and then shot the victim a second time as he lay on the ground.

Ms. Mack testified that after the defendant ran off the second time, Earline Jackson came out of her apartment, locked her door, walked down some steps, and fired a shot at the victim. She said that the first shot missed. She testified that Earline Jackson moved closer to the victim and shot him twice, once in the leg and again in the back. Ms. Mack said that the victim was begging for his life.

Frankie Sanford, a thirteen-year-old girl from the neighborhood, testified that she was riding her bicycle when she saw the defendant shoot the victim in the back. She said that she saw the defendant shoot once and then she saw a woman shoot the victim.

Teresa Taylor testified that she was in her kitchen when she heard a noise outside. She said that she looked out her kitchen window and saw the defendant chasing and cursing the victim. She testified that the victim got caught in her clothesline at about the same time that the defendant shot the victim in the back. Ms. Taylor stated that the defendant shot the victim two more times before he ran away. Ms. Taylor testified that she saw Dorothy Jackson and Lee-Lee approach the victim

4

after he had been shot. She said that Earline Jackson came out and told Lee-Lee to get away. She stated that neither the victim nor Lee-Lee had a gun.

Nicole McKinley, the victim's girlfriend, testified that on the day before the shooting, she was driving the victim's car when she had an accident. She said that she was returning to her apartment when the car she was driving hit a yellow Cadillac belonging to Earline Jackson's husband, Vernon. She testified that Vernon and Earline Jackson had just left the car when she hit it. Ms. McKinley testified that when the victim got home later that evening, he went to talk to Vernon and Earline Jackson. She said that he returned about ten minutes later and said everything was resolved.

Ms. McKinley testified that at the time of the shooting, she was hanging clothes on a line in her backyard. She testified that she heard someone say, "Somebody been hit," before she saw the defendant chasing the victim and before she saw and heard the defendant shooting at the victim. She said that the defendant shot the victim three or four times, the first from about twenty feet and the others from about twelve feet from the victim. Ms. McKinley testified that Earline Jackson then shot the victim, got into her car, and left. Ms. McKinley testified that after Earline Jackson left, she went to the victim, who was trying to say something but could not. Although Ms. McKinley testified that she did not see Lee-Lee either during or after the shooting, she stated that she had seen Lee-Lee and Robert Flynn with the victim earlier in the day.

Memphis Police Officer William Harsley testified that he had tagged a gun found in the yellow Cadillac. Officer Harsley said that the gun contained two live rounds and four spent casings.

Dr. O'Brien Cleary Smith, Assistant Medical Examiner for Shelby County, testified that he performed an autopsy on the victim. He stated that he determined that

5

the victim suffered six gunshot wounds, and he identified each one by a letter, A through F. Dr. Smith said gunshot wound A entered the front of the neck, went through the victim's windpipe, and fractured a portion of the victim's spine. He said that this wound, by itself, would have been fatal to the victim.

Dr. Smith testified that gunshot wound B was a superficial wound that entered at the front of the neck. He stated that gunshot wound C entered the victim's back. Dr. Smith said that gunshot wound D, by itself, could have been fatal to the victim. He said that it entered the victim's lower back, went through one kidney, and punctured his abdominal aorta. Dr. Smith testified gunshot wound E was a grazing wound to the victim's upper arm. He said that gunshot wound F was a flesh wound and the bullet had entered the back side of the victim's leg and traveled up his thigh.

Dr. Smith testified that gunshot wounds A and D could have been lethal, but it was possible for a victim to survive either one with rapid medical intervention. He could not say whether either wound by itself was certain to be fatal. He testified that the cause of death was multiple gunshot wounds. He said that he had no way of determining which wound was the actual cause of death of the victim.

Dr. Smith testified that he recovered five bullets from the body, one for each wound except gunshot wound E, which was the grazing wound. He said that the bullets were two different calibers. The parties stipulated that the bullet that caused gunshot wound D was from the revolver recovered from the yellow Cadillac and the other four bullets were from another gun that was unknown.

Rose Smart testified that on the day of the shooting she was outside with Dorothy Jackson and a lady named Montgomery when the victim, Robert Flynn, and a young boy came by. She said that as they passed by, she spoke to the boy, and the

6

victim told the boy, "Tell that bitch don't speak to you no more."  She testified that she said, "You can't tell me what to do," to which the victim replied, "You keep on talking, I'm going to dump you on your head like I dumped that bitch around there."  She testified that the defendant had approached them by this time and told the victim, "You ain't fixing to keep on talking to my auntie like that."  She said that the victim and Flynn turned around and came towards the defendant.  She testified that she told the defendant to leave, and he did.  She stated that the victim and Flynn also left, but in the opposite direction.

Ms. Smart testified that the victim and Flynn returned and that the victim asked her where the defendant was.  She said that the victim said he would see her later and then he left with Flynn, heading the same way that the defendant had left earlier.  She testified that she saw the defendant come back from that direction and he was dusty.  She said she saw the victim, Flynn, and Lee-Lee following the defendant.  She testified that the defendant then turned and started shooting.  She said that at that point, she ran into a neighbor's house.

Ms. Smart testified that after the shooting stopped, she saw Flynn and Lee-Lee kneeling near the victim.  She said that Flynn had two guns, and he passed one of them to Lee-Lee.  She testified that she did not see Nicole McKinley, but she heard someone shouting, "Go get Nicole."

Dorothy Jackson testified that she saw Robert Flynn with a gun.  She said that she saw Flynn about five minutes after the defendant shot the victim and while Earline Jackson was getting into the yellow Cadillac.  She testified that he came back running with a gun in his hand.  She said Flynn never got near the body but was pacing back and forth.  She said that Lee-Lee was also there, but she did not see him touch the victim.

7

The defendant testified that on the day of the shooting, he was outside with Rose Smart and her friends. He said that the victim came by with Robert Flynn, Lee-Lee, and a young boy. The defendant testified that he argued with the victim, but he left when his aunt told him to leave. He testified that he went to pick up a pair of short pants, and when he returned, he passed by the victim, Flynn, and Lee-Lee. He said that the victim swung at him, and the two fought.

The defendant testified that after the fight was over and as he was leaving, the victim threatened him. He said that he was scared and that he went to get his gun, which he had hidden nearby. He stated that he returned and saw Lee-Lee pass something to either the victim or Flynn. He testified that although he did not see any of the others with a gun, he shot because he feared for his life. He denied killing the victim. He testified that he shot in self-defense. The defendant testified that he did not shoot the victim in the back, and the victim was still standing after he shot him.

The defendant testified that he ran away after he shot the victim because he was scared. He stated that he left because he heard other shots and thought that the victim or his friends were going to come after him. He said that he threw the gun away after the shooting. He said that two hours after the shooting, he found out that the victim had died. The defendant testified that he did not wait around for the police to show up after the shooting because he was afraid that if he remained at the scene with a gun, he might be shot or get beaten. The defendant stated that five days after the shooting, he voluntarily turned himself in to the police.

The defendant testified that he had a gun to protect himself. He said that he lived in an area where others would come to shoot or to harm the residents. He testified that he had witnessed violence and had seen numerous murders in the area where he lived. He said that he bought his first gun when he was twelve years old.

8

Verlene Reynolds testified that she was in her house when she heard shots. She said that she ran outside and saw Earline Jackson shoot the victim. She stated that after Earline Jackson left, she saw Lee-Lee. She testified that Lee-Lee had a gun and that she told Lee-Lee that he better get rid of it before the police got there. She said that the ambulance arrived about thirty-five to forty minutes after the shooting.

## I. SUFFICIENCY OF THE EVIDENCE

The defendant contends that the evidence is insufficient to convict him because his actions were not the cause of the victim's death. He argues that the action of Earline Jackson was the intervening cause. He asserts that gunshot wound A was not an absolutely fatal wound and that the victim could have survived if not for gunshot wound D inflicted by Earline Jackson. He also asserts that Earline Jackson's actions were not foreseeable and were not events that would naturally flow from his conduct. The state contends that there is sufficient evidence that the defendant fatally shot the victim.

Our standard of review when the sufficiency of the evidence is questioned on appeal is "whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." Jackson v. Virginia, 443 U.S. 307, 319, 99 S. Ct. 2781, 2789, 61 L. Ed. 2d 560 (1979). This means that we may not reweigh the evidence, but must presume that the jury has resolved all conflicts in the testimony and drawn all reasonable inferences from the evidence in favor of the state. See State v. Sheffield, 676 S.W.2d 542, 547 (Tenn. 1984); State v. Cabbage, 571 S.W.2d 832, 835 (Tenn. 1978). Under this standard, the state is entitled to the strongest legitimate view of the evidence and all reasonable inferences which may be drawn from it. Cabbage, 571 S.W.2d at 835. That is, the testimony favoring the state is accredited and all

9

conflicts are resolved in favor of the state's theory. See State v. Williams, 657 S.W.2d 405, 410 (Tenn. 1983); State v. Hatchett, 560 S.W.2d 627, 630 (Tenn. 1978).

In order to sustain a criminal conviction for first degree murder, the evidence must establish that the defendant's actions or conduct caused the victim's death. Generally, this is established by showing that the victim's death was the natural and probable result of the defendant's unlawful act. See State v. Barnes, 703 S.W.2d 611, 614-15 (Tenn. 1985); State v. Ruane, 912 S.W.2d 766, 774 (Tenn. Crim. App. 1995). Our court has held that in order to convict a defendant, it is not necessary that the defendant's act be the sole cause of death nor the most immediate cause of death. State v. Roberson, 644 S.W.2d 696, 698 (Tenn. Crim. App. 1982). "It is only necessary that the defendant unlawfully contributed to the death of the deceased." Id.

In Roberson, the defendant was convicted of involuntary manslaughter when the ninety-year-old man that he beat during a robbery died three weeks after the beating. Id. at 697-98. The treating physician stated that the immediate cause of death was bronchial pneumonia, which the victim contracted while in the hospital. Id. The doctor testified that but for the beating, the victim would not have died of pneumonia. Id. This court held that the "victim's death was the natural and probable result of the defendant's unlawful acts." Id. In Barnes, our supreme court noted the holding in Roberson in determining that the death of a ninety-one-year-old woman, who died of complications from pneumonia, was directly caused by the man who beat her. Barnes, 703 S.W.2d at 615.

In the light most favorable to the state, the evidence shows that the defendant caused the death of the victim. The evidence shows through the assistant medical examiner's testimony that the gunshot wound attributed to the defendant was

10

fatal. The evidence further showed that although there was no way of determining which wound was the actual cause of death, the assistant medical examiner essentially attributed death to both gunshots. As the Roberson court noted, the defendant's act need not be the sole cause of death and a conviction will be upheld if the defendant unlawfully contributed to the victim's death. 644 S.W.2d at 698. Under these circumstances, we conclude that a rational trier of fact could find beyond a reasonable doubt that the defendant caused the death of the victim and was guilty of first degree murder.

## II. BIBLICAL REFERENCES

The defendant contends that the trial court erred by not declaring a mistrial when the prosecutor cited the Bible in its closing argument. The defendant argues that the biblical references were improper and prejudicial. The state contends that the biblical references do not constitute reversible error unless they clearly affected the jury's verdict.

During the state's rebuttal closing argument, the following occurred:

[PROSECUTOR KITCHEN'S CLOSING]: You know, the judge is going to charge you the law about flight. But the good book, ladies and gentlemen, also talks about someone's flight, the flight of a person.

[DEFENSE COUNSEL]: Your Honor, I'm going to object and ask to approach the bench.

THE COURT: All right, sir.

[DEFENSE COUNSEL]: I don't know what passage he is about to read from the Bible, Your Honor, but I would suggest that saying that God's law should convict this man or if he is implying anything of that nature, that the good book says this man, if he runs he is guilty, or the good book says that he killed this man, I think that is really pushing it.

That is not -- the law is not the Bible, Your Honor. The law is the law the state of Tennessee has passed by the Tennessee legislature, and I would suggest that he is treading on ground that is improper and that he is pulling on their religious beliefs as to whether or not to convict this man. And

11

I would ask that he put the Bible away and not be allowed to do that.

THE COURT: Mr. Kitchen.

MR. KITCHEN: Your Honor, I am commenting on the evidence, and I am bringing in a passage that states that "The wicked will flee when no man pursueth" --

[DEFENSE COUNSEL]: Your Honor.

MR. KITCHEN: -- "and the righteous will stand as bold as a lion." That is a comment on flight. That's putting it in another way. That's all I'm doing --

[DEFENSE COUNSEL]: Your Honor, it's saying --

MR. KITCHEN: -- and I have a right to comment on the evidence.

[DEFENSE COUNSEL]: -- saying that the Bible, God's word, God's book says that if you flee you are the wicked, Your Honor, that is improper.

THE COURT: Let me say this. I think one of the problems, Mr. Kitchen, is that some of the jurors may think that the law in the scripture is higher than my law. And I agree with [defense counsel] that I think we might -- we are treading reversible grounds here. You can discuss it with them, but I'd ask you not to read from the Bible as authority.

. . .

[MR. KITCHEN'S CLOSING]: Ladies and gentlemen, the wicked will flee --

[DEFENSE COUNSEL]: Your Honor, may I approach the bench?

THE COURT: Yes, sir. Excuse me, ladies and gentlemen.

[DEFENSE COUNSEL]: Your Honor, I'm going to move for a mistrial. They know he got that directly out of that Bible. He went back and said exactly what he was going to say. Anybody that has had any reading of the Bible knows that's in there. They saw him put the Bible down. They saw him reading it before he said it, Your Honor. I call for -- I would ask for a mistrial at this time.

THE COURT: That will be denied.

[DEFENSE COUNSEL]: Thank you.

THE COURT [ADDRESSING THE JURY]: Ladies and gentlemen, just so you will understand what we are doing here,

12

when I told you that the only law that you could get would be from the Court's instructions, that also means that you cannot use the Bible or the Talmud or the Torah or any kind of holy work as law. Regardless of this Court's opinion as to scripture or whatever else, we can't, since we have separation of church and state in here, we have to try these cases on the law that is established by courts rather than law established by holy works.

Mr. Kitchen can comment to you on what he believes is true about the world and nature and in the proof. But you are not in any way to accept some other work as higher authority for purposes of deciding this case only, than the law the Court is going to give you.

All right. Mr. Kitchen, you may proceed.

[MR. KITCHEN'S CLOSING]: Ladies and gentlemen, the judge will charge you about flight which simply says to a degree that if someone leaves the scene of an incident that you can take that into consideration as to an inference of the person's guilt.

"The wicked will flee when no man pursueth, but the righteous will stand as bold as a lion." What does that mean?

What are you hiding? Why did you throw away the gun? Why did you hide out for five days? Get your story straight? See if anybody was going to identify you? Maybe no one is going to talk because everyone will be too scared because we live in such a dangerous community.

Our supreme court has recognized that closing argument is a valuable privilege for both the state and the defense and that counsel is afforded wide latitude in presenting final argument to the jury. See State v. Cribbs, 967 S.W.2d 773, 783 (Tenn. 1998); State v. Cone, 665 S.W.2d 87, 94 (Tenn. 1984). When a prosecutor's argument goes beyond the latitude afforded, the test for determining if reversal is required is whether the impropriety "affected the verdict to the prejudice of the defendant." Harrington v. State, 215 Tenn. 338, 340, 385 S.W.2d 758, 759 (1965). Factors relevant to that determination include:

1. The conduct complained of viewed in context and in light of the facts and circumstances of the case.

2. The curative measures undertaken by the court and the prosecution.

13

3. The intent of the prosecutor in making the improper statement.

4. The cumulative effect of the improper conduct and any other errors in the record.

5. The relative strength or weakness of the case.

Judge v. State, 539 S.W.2d 340, 344 (Tenn. Crim. App. 1976).

In Cribbs, the defendant argued that it was prosecutorial misconduct for the prosecutor to use the passage, "whatever a man sows, so shall he reap," in his argument during the sentencing phase. 967 S.W.2d at 783. The court stated, "It is well-established in Tennessee law that references to biblical passages or religious law during the course of a criminal trial are inappropriate." Id. at 784. However, the court concluded that the biblical references did not affect the verdict to the prejudice of the defendant. Id.

In this case, the state wanted to put the flight instruction into perspective for the jury. The evidence showed that the defendant left the scene after the shooting. The defendant testified as to why he left the scene. Without the biblical reference, the state could properly comment on this evidence and the significance of flight. We note that the trial court gave a curative instruction to the jury but still permitted the state to use the biblical passage. We also note that there was overwhelming evidence of the defendant's guilt. We conclude that the improper argument did not affect the verdict to the substantive prejudice of the defendant.

We must note, though, that this court has previously reviewed the same prosecutor for using the Bible and making biblical references during closing argument. While discussing flight during closing argument in State v. Alfonzo E. Anderson and Barry Woodley, No. 02C01-9419-CR-00243, Shelby County (Tenn. Crim. App. Sept. 20, 1995), app. denied as to Anderson (Tenn. May 6, 1996), the prosecutor quoted

14

from the Bible and stated, "This is the real law book." Slip op. at 8. After objection, the trial court instructed the jury that this was just closing argument and that they were to consider only what they heard in the case. Id. Following the trial judge's admonition, the prosecutor made another brief reference to the same biblical passage. Id. The Anderson court held that the prosecutor's conduct did not constitute reversible error because the prosecutor's comments were limited in scope, the trial court gave a curative instruction, and the defendant had not shown how he was prejudiced by the comments.

In this respect, we hasten to add that the fact that we hold the error to be harmless in the present case should not be taken as precedent for similar improper argument in the future. We note that Anderson was decided approximately two months before the trial in the present case began. Our supreme court has stated that "it is inappropriate for the appellate courts to preside over the creation of a body of 'harmless error law'" arising from the continued failure of a trial court to meet procedural requirements. State v. Gorman, 628 S.W.2d 739, 740 (Tenn. 1982). We believe it to be similarly inappropriate for a continuing practice of prosecutors using biblical references during trial. At some point, the need to preserve the integrity of the judicial process will require that the continued practice not be subject to the harmless error rule.

### III.  FLIGHT INSTRUCTION

The defendant contends that the rule allowing the jury to hear an instruction on flight should be reconsidered. He argues that a flight instruction is unduly prejudicial considering the defendant's age (sixteen years old) and immaturity. Also, he argues that public policy should favor individuals voluntarily turning themselves in to the police, particularly when they do so after they have time to reflect on their actions and only a short time has elapsed after the crime was committed. The jury was charged with the following instruction on flight:

15

The flight of a person accused of a crime is a circumstance which, when considered together with all the facts of the case, may justify an inference of guilt. Flight is the voluntary withdrawal of oneself for the purpose of evading arrest or prosecution for the crime charged. Whether the evidence presented proves beyond a reasonable doubt that the defendant fled is a question for your determination.

The law makes no nice or refined distinction as to the manner or method of a flight; it may be open, or it may be a concealment within the jurisdiction. However, it takes both a leaving the scene of the difficulty and a subsequent hiding out, evasion, or concealment in the community, or a leaving of the community for parts unknown, to constitute flight.

If flight is proved, the fact of flight alone does not allow you to find that the defendant is guilty of the crime alleged. However, since flight by a defendant may be caused by a consciousness of guilt, you may consider the fact of flight, if flight is so proven, together with all of the other evidence when you decide the guilt or innocence of the defendant. On the other hand, an entirely innocent person may take flight and such flight may be explained by proof offered, or by the facts and circumstances of the case.

Whether there was flight by the defendant, the reasons for it, and the weight to be given to it, are questions for you to determine.

In State v. Smith, 893 S.W.2d 908 (Tenn. 1994), our supreme court reviewed the effect of a flight instruction when the defendant abandoned a stolen car filled with stolen goods and remained free for one year. Id. at 918. The defendant murdered an elderly woman while burglarizing her home. Id. at 911-12. As the defendant was leaving, the car he took from the victim became stuck in the mud near the victim's house. Id. at 911. A police officer, responding to another call, noticed the car as he drove by the area. Id. After the officer returned from the call, he checked the car and found that the engine was still warm. Id. Our supreme court held that the facts led to a reasonable inference that the defendant saw the police cruiser drive by with its lights flashing and abandoned the car stuck in the mud. Id. at 918. The court held that there was also evidence that the defendant concealed himself. Id. Although not holding that the flight instruction given was error, the court addressed the issue of the effect of a flight instruction given in error:

16

> Even if an instruction on flight should not have been given, any error is not reversible. The Court instructed the jury that whether the Defendant fled was a question solely for their decision, that they need not infer flight, and that flight alone was insufficient to prove guilt. This, coupled with the overwhelming proof of Defendant's guilt, renders any error as to the flight instruction harmless.

Id.

In the present case, the evidence shows that after the defendant shot the victim, he left the scene. The evidence also shows that two hours after the shooting, the defendant knew the victim had died, but he still remained hidden in the community for five days. We conclude that a flight instruction was warranted.

The defendant argues that the facts and circumstances in this case are such that the flight instruction should not have been given. He asserts that public policy should not penalize those that voluntarily turn themselves in to the police. In this case, the flight instruction pointed out to the jury that innocent persons may take flight, and it was up to the jury to determine whether there was flight, the reasons for the flight, and the weight to be given to it. Just as the instruction allowed an inference of guilt from flight, it also instructed that the evidence, facts, and circumstances may show that an innocent person may take flight.

The evidence shows that the defendant was young, living in a dangerous neighborhood, and was scared. The Smith court held that it was up to the jury to determine the meaning and the weight of this type of evidence. 893 S.W.2d at 918. We conclude that the flight instruction properly charged the jury with their duty and did not unduly prejudice the defendant.

In consideration of the foregoing and the record as a whole, we affirm the defendant's conviction for first degree murder.

17

 

                                         _____

                                         Joseph M. Tipton, Judge

CONCUR:


_____
David G. Hayes, Judge


(Not Participating)_____
William M. Barker, Judge

18