IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT JACKSON
Assigned on Briefs May 8, 2001

## STATE OF TENNESSEE v. JIMMY WARDEL GLENN

**Appeal from the Circuit Court for Lauderdale County**
**No. 6765-B     Joseph H. Walker, Judge**

---

**No. W2000-02590-CCA-R3-CD  - Filed July 19, 2001**

---

The Defendant, Jimmy Wardel Glenn, was convicted by a jury of possession with intent to deliver over .5 grams of cocaine.  He was subsequently sentenced as a Range I, standard offender to nine years incarceration.  In this appeal as of right, the Defendant asserts that the trial court erred by failing to grant a mistrial after a comment made by the State during its opening statement and that the evidence was insufficient to support the conviction.  We find no error; thus, we affirm the judgment of the trial court.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Circuit Court Affirmed**

DAVID H. WELLES, J., delivered the opinion of the court, in which ALAN E. GLENN, J., and L. TERRY LAFFERTY, SR.J., joined.

Gary Antrican, District Public Defender; Julie K. Pillow, Assistant Public Defender, Somerville, TN 38068, for the appellant, Jimmy Wardel Glenn.

Paul G. Summers, Attorney General and Reporter; John H. Bledsoe, Assistant Attorney General; Elizabeth Rice, District Attorney General; and Tracey A. Brewer, Assistant District Attorney General, for the appellee, State of Tennessee.

**OPINION**

The proof at trial established that on January 30, 1999, a search warrant was issued for a residence located at 5761 Edith Central Road in Lauderdale County, Tennessee.  The warrant was based upon an affidavit by Investigator Gregg Land of the Ripley Police Department and was issued against the Defendant and Tracy Gatlin, also known as Tracy Allen and Tracy Cousar, who was indicted as a co-defendant but pled guilty prior to the Defendant's trial.  Investigator Land testified that he was involved in a controlled buy of cocaine at the residence on January 30, 1999, which led to the procurement of the search warrant.  He explained that a confidential informant was wired with an audio microphone and sent into the residence to attempt to purchase cocaine.  The confidential informant returned with a quantity of cocaine, but Investigator Land was unable to understand what

transpired inside the residence due to noise from a dog barking and the television playing in the background. He could not identify the voice of the person selling the cocaine as male or female or black or white. Investigator Land testified that four officers, including himself, listened to the drug transaction, and the other officers might have recognized the voice, but he did not. He said that he had been with the drug task force approximately a year and a half. After retrieving the cocaine from the informant, the officers left the scene in order to procure a search warrant.

Investigator Land was also involved in the execution of the search warrant, which occurred within an hour after the search warrant was procured. Investigator Land stated that he and two other officers went to the front door of the residence, announced their presence, and entered the house. One of the other officers found Ms. Gatlin laying on a bed in the bedroom; she was the only person found inside the residence. During the search of the residence, the officers found $480, cocaine, cocaine base, a shotgun, a pager, and a cellular telephone. According to Investigator Land, when he reached for the money, which was on top of the couch, Ms. Gatlin stated, "That's not mine. That's Noon's." Investigator Land explained that Ms. Gatlin was referring to the Defendant, who went by the nickname of "Noon." Investigator Land then pulled the cushions off the couch and discovered what appeared to be drugs in a hole in the couch. Ms. Gatlin immediately stated, "I don't know anything about that. That's not mine. That's Jimmy's." Ms. Gatlin was again referring to the Defendant. Investigator Land testified that he took possession of the drugs seized at the residence and personally delivered them to the Tennessee Bureau of Investigation (TBI) crime laboratory for identification. Lisa Mays, a forensic scientist with the TBI, testified without objection that she positively identified the substances delivered by Investigator Land as 5.5 grams of cocaine and 3.0 grams of cocaine base, which is more commonly known as crack cocaine.

Investigator John Thompson with the Lauderdale County Sheriff's Department testified that he has been investigating drug crimes for the sheriff's department for the past eight years. During that time, he has investigated hundreds of drug cases. Early in January of 1999, the sheriff's department began working with the Ripley Police Department on a drug task force. On the night of January 30, 1999, Investigator Thompson was working with the Ripley Police Department on a controlled purchase of cocaine and the subsequent execution of a search warrant. Four officers were present during the controlled buy. The officers outfitted the confidential informant, Jamie Kirkpatrick, with an audio transmitter, searched him, and gave him $100 to use to purchase cocaine. The informant was dropped off near Ms. Gatlin's house, and the officers watched him enter the residence. The transaction was conducted inside, and the informant returned to the officers with a quantity of cocaine. Investigator Thompson testified that the substance field tested positive for cocaine, and a search warrant was then procured for the residence.

According to Investigator Thompson, the informant began speaking to a male subject when he entered the house, and he told the person that he wanted "a hundred pack." Investigator Thompson testified that he recognized the voice of the person to whom the informant was talking from past experience with the person. He stated that the voice belonged to the Defendant, and he identified the Defendant in court as the person belonging to the voice he heard on the audio transmitter selling cocaine to the informant. Investigator Thompson did not hear any other voices

in the residence.  He testified that he did not remember a dog barking or a television in the background, but that he did recognize the Defendant's voice.  When he heard the voice, he exclaimed, "That's Jimmy there, that's Jimmy there."  Due to his past experience with the Defendant, Investigator Thompson knew that the Defendant had been living at 993 Long Hole Road, but he asserted that when the search warrant was executed, the Defendant was no longer living at that address but was instead living with Ms. Gatlin.

Lieutenant Mawyer with the Ripley Police Department testified that he has been in law enforcement for seventeen or eighteen years, seven or eight of which have been spent as a member of the drug task force.  On January 30, 1999, he was involved in a controlled buy and a search warrant executed at Ms. Gatlin's residence.  Lieutenant Mawyer was present when the confidential informant entered the residence and purchased cocaine, and he listened to the transaction through the audio transmitter.  Although Lieutenant Mawyer did not recognize the voice of the person who sold the cocaine to the informant, he did determine that it was a male voice.  He explained that oftentimes audio transmitters transmit background noises such as televisions, children playing, and semi-trucks driving by, and the officers monitoring those transmitters have to learn how to tune out the background noises and concentrate on the conversation.  Of the four officers listening to the transaction, Investigator Land had the least amount of experience.

Tracy Gatlin testified that the Defendant was living with her in January 1999.  He had been living with her for three weeks, and he was at her house on January 30, 1999.  She saw the Defendant there when she went to lay down, but he was not there when the officers arrived to execute the search warrant.  Ms. Gatlin testified that the officers found drugs in her couch, but the drugs did not belong to her.  She said she told the officers they were not her drugs and she did not know who they belonged to.  She did say that some of the money was probably hers.  She had cashed a check and given the money to the Defendant to pay the bills.

According to Ms. Gatlin, Jamie Kirkpatrick came to her house on January 30, 1999.  Although she was in the bedroom, she said she heard Mr. Kirkpatrick's voice in the living room.  She testified that Mr. Kirkpatrick said the reason he was there "was to get that nigger out of my house."  Ms. Gatlin explained that Mr. Kirkpatrick was her cousin and that her family had problems with her dating the Defendant, who was black.  Sometimes the Defendant had hidden in the attic to avoid confrontations with her family or her landlord, who was also prejudiced.  Ms. Gatlin denied ever seeing the Defendant sell drugs at her house, and she denied telling any officer that the drugs found belonged to the Defendant.

## FAILURE TO GRANT MISTRIAL

The Defendant first argues that the trial court erred by denying his request for a mistrial when the prosecutor suggested in the opening statement that the Defendant had been implicated in domestic violence issues.  He further asserts that the actions of the prosecutor in making the comment during opening statement and then questioning Ms. Gatlin about arguments with the Defendant constituted prosecutorial misconduct which resulted in an unreliable verdict.  We disagree.

During opening statement, the prosecutor informed the jury that she would prove the items seized at the residence belonged to the Defendant. The prosecutor then stated, "How do we know that [the Defendant] has been in this residence? Well, the sheriff's department has been out there on numerous domestic violence between the woman --." At this point, the Defendant objected and moved for a mistrial, asserting that the jury had been tainted by mention of prior bad acts on the part of the Defendant, which are inadmissible under Tennessee Rule of Evidence 404(b). The trial court sustained the Defendant's objection to reference to any prior bad acts, but denied the motion for a mistrial and instead gave the following curative instruction:

> Ladies and gentlemen, you are reminded that statements made by counsel in opening are not evidence and are not to be considered by you as evidence. The counsel state what they intend to show through the facts.
>
> The Court can rule on various matters that can be presented and can't be presented, and will make those rulings throughout the course of the trial. At this point in the proceeding the attorneys can only tell you what they believe the facts will show. You are to disregard the last few remarks of the Assistant District Attorney for what she thinks that they will prove. Some things may or may not be proven during the course of the trial, but at this point I ask that you disregard those remarks.

The decision of whether to grant a mistrial is a matter within the discretion of the trial court, and we will not disturb the trial court's action on appeal absent an abuse of that discretion. State v. Millbrooks, 819 S.W.2d 441, 443 (Tenn. Crim. App. 1991). Generally, a mistrial will only be declared "if there is a manifest necessity requiring such action by the trial judge." Arnold v. State, 563 S.W.2d 792, 794 (Tenn. Crim. App. 1977). "If it appears that some matter has occurred which would prevent an impartial verdict from being reached, a mistrial may be declared." Id.

We are unable to find "manifest necessity" for a mistrial based on the prosecutor's comment. The prosecutor was attempting to tell the jury what she expected the proof to show, and the Defendant timely objected to any reference to prior bad acts which might be inadmissible. Due to the trial court's ruling, the prosecutor was not permitted to inform the jury in opening statement that the Defendant had been involved in domestic disputes, and the trial court instructed the jury to disregard the comment of the prosecutor regarding any domestic violence. A jury is presumed to follow a trial court's instructions. Millbrooks, 819 S.W.2d at 443. Accordingly, we do not believe the brief comment by the prosecutor could have caused the jury to convict the Defendant based on prior bad acts and not the evidence presented at trial. Thus, the denial of a mistrial after the prosecutor's comment was not an abuse of discretion.

Nevertheless, the Defendant argues that this comment by the prosecutor, coupled with improper questioning of Ms. Gatlin, constituted prosecutorial misconduct which caused the jury to decide the case on an improper basis. He assets that this improper questioning compounded the trial court's error in denying a mistrial because "it became apparent that the whole mention of the subject of domestic violence in connection with the defendant was little more than a thinly disguised attempt

to influence the jury in an improper manner touching on the defendant's character in violation of the principles of Rule 404."

When reviewing allegations of prosecutorial misconduct, "[t]he general test to be applied is whether the improper conduct could have affected the verdict to the prejudice of the defendant." Harrington v. State, 385 S.W.2d 758, 759 (Tenn. 1965); see also State v. Richardson, 995 S.W.2d 119, 127 (Tenn. Crim. App. 1998). Factors relevant to that determination include:

1. The conduct complained of viewed in context and in light of the facts and circumstances of the case.
2. The curative measures undertaken by the court and the prosecution.
3. The intent of the prosecutor in making the improper statement.
4. The cumulative effect of the improper conduct and any other errors in the record.
5. The relative strength or weakness of the case.

Judge v. State, 539 S.W.2d 340, 344 (Tenn. Crim App. 1976).

The Defendant complains about the prosecutor's reference to domestic violence during her opening statement and during her subsequent questioning of Ms. Gatlin. During a jury-out hearing following opening statements, the Defendant requested a hearing outside the presence of the jury prior to any attempt by the prosecutor to introduce evidence regarding prior bad acts on the part of the Defendant. At that point, the prosecutor indicated that she was not trying to introduce evidence that the Defendant had been charged with domestic violence but that she was trying to establish that the Defendant was a resident at Ms. Gatlin's house. She explained that Investigator Thompson had seen the Defendant at the residence when the police were called out on domestic violence disputes and that he would testify to that effect. The trial court then ruled that it would have a jury-out hearing prior to Investigator Thompson's testimony. However, before the jury-out hearing was held, Tracy Gatlin was called as a witness. During direct examination, Ms. Gatlin stated that she did not know where the Defendant was when the officers came to execute the search warrant because she and the Defendant had had an argument, and the Defendant was going to leave. Later during direct examination, the prosecutor asked Ms. Gatlin what she and the Defendant had argued about that day, and Ms. Gatlin responded, "That's our personal life. It didn't have anything to do with drugs. It had to do jealousy [sic]." The prosecutor did not further pursue the question at that time, but later asked, "Other than just the argument with Jimmy Glenn on that particular day, you've never had any other problems with him, is that correct?" Ms. Gatlin again replied, "We -- that's personal. Our personal life is our personal life." The Defendant did not object to either question, and the prosecutor did not ask any further questions about arguments with the Defendant. Subsequently, during the jury-out hearing prior to Investigator Thompson's testimony, Investigator Thompson was asked how he knew the Defendant was living with Ms. Gatlin. Instead of responding that he had seen the Defendant there during domestic violence disputes, Investigator Thompson responded that the sheriff had given him a tip that the Defendant was living there, and the confidential informant also told him that the Defendant was living there. Neither the prosecutor nor the Defendant ever asked Investigator Thompson whether he had seen the Defendant at Ms. Gatlin's house during domestic violence disputes, and that evidence was never brought out at trial.

The Defendant argues that Investigator Thompson's responses indicate that the prosecutor had no factual basis for making the comment during opening statement or for questioning Ms. Gatlin about arguments with the Defendant. He asserts that "the circumstances suggest that it was a calculated effort to influence the jury to decide the case on the basis of the defendant's bad character." We do not agree with the Defendant's interpretation of the circumstances. Because Investigator Thompson was never asked whether he observed the Defendant at Ms. Gatlin's residence during domestic violence disputes, there is no evidence that the prosecutor lacked a factual basis for her comment and questioning. The prosecutor could have simply decided to abandon a line of questioning which had resulted in objections from the defense after Investigator Thompson provided another basis for his belief that the Defendant was living with Ms. Gatlin. Furthermore, aside from the evidence that the Defendant had sold cocaine to the confidential informant, there was never any proof introduced regarding the Defendant's bad character. The jury was instructed that statements by the attorneys were not to be considered as evidence and that it should disregard the prosecutor's statement regarding domestic violence. Although Ms. Gatlin was questioned about arguments, she declined to answer the prosecutor's questions. Thus, there was no evidence offered connecting the Defendant to any type of domestic abuse. There was, however, more than ample evidence connecting the Defendant to the crime. Accordingly, we conclude that the Defendant was not prejudiced by the prosecutor's comment and questioning of Ms. Gatlin.

SUFFICIENCY OF THE EVIDENCE

The Defendant also challenges the sufficiency of the convicting evidence. Tennessee Rule of Appellate Procedure 13(e) prescribes that "[f]indings of guilt in criminal actions whether by the trial court or jury shall be set aside if the evidence is insufficient to support the findings by the trier of fact of guilt beyond a reasonable doubt." Evidence is sufficient if, after reviewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt. See Jackson v. Virginia, 443 U.S. 307, 319 (1979); State v. Smith, 24 S.W.3d 274, 278 (Tenn. 2000). In addition, because conviction by a trier of fact destroys the presumption of innocence and imposes a presumption of guilt, a convicted criminal defendant bears the burden of showing that the evidence was insufficient. See McBee v. State, 372 S.W.2d 173, 176 (Tenn. 1963); see also State v. Buggs, 995 S.W.2d 102, 105-06 (Tenn. 1999); State v. Evans, 838 S.W.2d 185, 191 (Tenn. 1992); State v. Tuggle, 639 S.W.2d 913, 914 (Tenn. 1982).

In its review of the evidence, an appellate court must afford the State "the strongest legitimate view of the evidence as well as all reasonable and legitimate inferences that may be drawn therefrom." Tuggle, 639 S.W.2d at 914; see also Smith, 24 S.W.3d at 279. The court may not "re-weigh or re-evaluate the evidence" in the record below. Evans, 838 S.W.2d at 191; see also Buggs, 995 S.W.2d at 105. Likewise, should the reviewing court find particular conflicts in the trial testimony, the court must resolve them in favor of the jury verdict or trial court judgment. Tuggle, 639 S.W.2d at 914. All questions involving the credibility of witnesses, the weight and value to be given the evidence, and all factual issues are resolved by the trier of fact, not the appellate courts. See State v. Morris, 24 S.W.3d 788, 795 (Tenn. 2000); State v. Pappas, 754 S.W.2d 620, 623 (Tenn. Crim. App. 1987).

Looking at the evidence in the light most favorable to the State, we conclude that there was more than sufficient evidence for a rational jury to conclude that the Defendant possessed cocaine with the intent to deliver it. Ms. Gatlin testified that the Defendant was living with her on January 30, 1999, and she saw the Defendant there before she went to lay down. She also heard Jamie Kirkpatrick, who was her cousin and also the confidential informant, talking in the living room. Investigator Thompson, who was familiar with the Defendant due to past experience, testified that he recognized the Defendant's voice as the person selling cocaine to the confidential informant and that he exclaimed, "That's Jimmy there, That's Jimmy there," when he heard the Defendant's voice. When the search warrant was executed, the officers found $480, 5.3 grams of cocaine, and 3.0 grams of cocaine base. According to Investigator Land, Ms. Gatlin told the officers that the cocaine must belong to the Defendant. We thus hold that the evidence was sufficient to support the Defendant's conviction.

The judgment of the trial court is affirmed.

_____
DAVID H. WELLES, JUDGE