IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT NASHVILLE
Assigned on Briefs May 21, 2002

## STATE OF TENNESSEE v. KYNASTON SCOTT a.k.a. KYNASTON L. OLAWUMI

**Direct Appeal from the Criminal Court for Davidson County**
**No. 2000D-2256     Seth Norman, Judge**

_____

**No. M2001-00707-CCA-R3-CD - Filed December 20, 2002**

_____

The appellant, Kynaston Scott a.k.a. Kynaston L. Olawumi, was convicted by a jury in the Davidson County Criminal Court of first degree murder and felony murder. The trial court merged the convictions and sentenced the appellant to life imprisonment in the Tennessee Department of Correction. On appeal, the appellant contends that the evidence was not sufficient to support his convictions, the trial court erred by instructing the jury on flight, and the trial court erred in admitting an inflammatory photograph. Upon review of the record and the parties' briefs, we affirm the judgment of the trial court.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Criminal Court is Affirmed.**

NORMA MCGEE OGLE, J., delivered the opinion of the court, in which THOMAS T. WOODALL and JOHN EVERETT WILLIAMS, JJ., joined.

Dwight E. Scott, Nashville, Tennessee, for the appellant, Kynaston Scott a.k.a. Kynaston L. Olawumi.

Paul G. Summers, Attorney General and Reporter; Renee W. Turner, Assistant Attorney General; Victor S. Johnson, III, District Attorney General; and Lisa Naylor and Shelli Neal, Assistant District Attorneys General, for the appellee, State of Tennessee.

**OPINION**

### I.  Factual Background

In the early morning hours of March 29, 1998, the victim, Melvin Sharp, was found slumped behind the wheel of his vehicle in the Second Street area of Nashville. Melvin Sharp had been shot in the head and was dead at the time his body was discovered by police. The appellant was subsequently charged with one count of first degree murder and one count of felony murder.

At trial, Lori M. Sharp testified that in March 1998 she and her husband Melvin Sharp worked at the McDonald's restaurant at 1201 Broadway in Nashville. Lori Sharp was the general manager and Melvin Sharp was her first assistant. The Sharps made the restaurant's bank deposits each day at First American Bank on McGavock Pike. In preparation for deposit, the money was placed in First American deposit bags and each manager had a drop key which was required to make the deposit. However, the couple had only one drop key, which they kept on a separate key ring at their home. The one on duty usually took the key when leaving for work. On March 28, 1998, Melvin Sharp left for work around 4:00 a.m. He did not take the key to work with him that day.

Lori Sharp last spoke with her husband around 6:00 to 8:00 p.m. that evening when he called from work to tell her that he planned to stop by his brother's house to eat fish. Lori Sharp related that she and her husband owned a 1995 Mazda 626 which was a "burgundy, reddish color." Her husband had driven the car to work that day. The victim did not carry a wallet, but kept his money, driver's license, Social Security card, and health insurance card in a small "daytimer." After his death, his watch, a cigarette lighter, and sixty to eighty dollars ($60 to $80) were returned to Lori Sharp.

On March 29,1998, Officer Dan Shagger of the Metropolitan Police Department was assigned to work the area around Second Street. He was assigned to the area due to the high crime rate. Around 1:00 a.m., Officer Shagger drove down Second Street and noticed a 1995 Mazda parked facing the wrong direction on the 400 block section of Second Street. As he approached the car, he observed that the engine was running and a turn signal was activated. When he got closer, he saw that the driver of the car was slumped over behind the steering wheel. Officer Shagger thought the driver had been drinking or had fallen asleep. However, when he reached the car he saw that the passenger window was shattered. The driver was bleeding from the head and was not breathing. Officer Shagger immediately called an ambulance.

Officer Shagger explained that approximately thirty minutes to an hour earlier he had driven down the street but had not seen the vehicle. At the time he discovered the victim there was no one around the car. He observed that "[i]t was either being ignored at all and then once I called an ambulance, that's when everybody came out." He immediately marked off the crime scene, taking care to ensure that the parameters were set far enough from the vehicle to keep people out of the area. He explained that a large number of apartments were located near the scene. Officer Shagger spoke with "one or two" individuals who advised him that they had not seen or heard anything.

Officer Harmon Hunsicker of the Metropolitan Police Department assisted in processing the crime scene. At the crime scene, he removed two pieces of a bullet from the passenger door of the vehicle and also removed a bank deposit bag from underneath the victim's seat. He then had the Mazda towed to the identification processing laboratory where the vehicle was searched and evidence collected. Approximately four thousand dollars ($4000) was removed from the bag. Officer Hunsicker helped identify the victim by comparing the victim's fingerprints with those on file with the police department.

-2-

In the early morning hours of March 29, 1998, fifteen-year-old Jeffrey Pinshon was "just out chillin'" with Joe Vaughn and Rudy Vaughn. They had not been drinking, but had smoked marijuana earlier in the evening. The group had been together approximately two hours and were sitting on the front of a car near the Lane Garden apartments when they saw the appellant come from "out of the projects." The appellant approached the group and stated that he needed some money. They advised the appellant that they did not have any money. The appellant then walked over to a car and "all we heard then was a gun shot." Immediately thereafter, the appellant walked down the street and Pinshon went home. At the time, Pinshon knew that someone had been hurt, but he did not stay around to assist or call police. Pinshon explained that he was on juvenile probation and was not supposed to be out late or smoking marijuana. Pinshon had seen the appellant on an earlier occasion when the appellant tried to "jump on" his cousin.

On March 31, 1998, Pinshon received a call from Peggy Wilma. Pinshon knew Wilma "from a friend of her son." Wilma advised Pinshon that a detective was looking for him and his friends. Pinshon went to Wilma's house and spoke with Detective Pat Postiglione. Pinshon initially denied that he saw the shooting. However, after speaking further with the detective, he voluntarily accompanied Detective Postiglione to the police department where he gave a taped statement in which he admitted that he witnessed the shooting. He was shown a photographic lineup and was able to identify the appellant as the shooter. Although Pinshon did not know the appellant's full name, he related that the appellant was known as "K."

In November 2000, Pinshon was serving a sentence at Taft Youth Developmental Center. While there, the appellant's brother, Jason Scott, gave Pinshon a letter from the appellant. Pinshon and Scott had become friends when they were "locked up together and shipped off."

Joe Vaughn was fourteen years old in March 1998 and was living with his mother in Lane Garden Apartments. On the night of the shooting, he was outside the apartments with Rudy Vaughn and Jeffrey Pinshon. The appellant approached them and walked up to Pinshon. Joe Vaughn related that although the appellant had a hood on his head, he was able to see the appellant's face. He recognized the appellant because he had seen him on the church bus. The appellant "went around to the car, the driver side and shot a man." He fired one shot and "took off running." Joe Vaughn did not see the gun but did see the flash from the gun. After the shooting, Joe Vaughn ran home. Later, Wilma told him that the police were looking for him. On April 3, 1998, Joe Vaughn spoke with Detective Postiglione and described the events that he had witnessed. He also identified the appellant from a photographic line-up.

Lieutenant Karl E. Graves testified that he was the jail administrator with the Sheriff's Department in Belmont, New York. In that capacity, he received a letter from the appellant who was an inmate in the jail. At the time of his arrest in New York, the appellant identified himself as Kynaston Olawumi. After receiving the letter, Lieutenant Graves spoke with the appellant. The appellant advised Lieutenant Graves that if he entered a different Social Security number in the computer, he would find that the appellant was wanted in Nashville, Tennessee. Subsequently, the appellant admitted that he was Kynaston Scott and that he was wanted in Nashville for a homicide.

The appellant asserted that a mistake had been made and he wanted to return to Nashville to explain what had happened. The appellant was subsequently released to the custody of a Nashville police detective.

Officer Charles Blackwood testified that he was employed in the identification section of the Metropolitan Police Department. Specifically, he processed items for latent fingerprints. In this case, he was asked to process two handwritten letters. He found a usable print on one letter, which print was then submitted to Lorita Marsh for comparison to other prints.

Lorita Marsh testified that she was a police identification analyst with the Metropolitan Police Department. Her official duties involved "[d]eclassification and comparison of fingerprints." Marsh compared a fingerprint obtained from a handwritten letter with a fingerprint of the appellant. She identified the fingerprint on the letter as that of the appellant.

Thomas Vasrick, a forensic document examiner, testified that he compared the handwriting in the letter written to the appellant's brother with the handwriting on an affidavit of indigency completed by the appellant. Vasrick concluded that both documents were written by the appellant.

Detective Pat Postiglione worked in the homicide unit of the Metropolitan Police Department and was the lead detective in the homicide of Melvin Sharp. Detective Postiglione arrived at the scene of the murder at approximately 2:00 a.m. on March 29. At the time Detective Postiglione arrived, the victim was still inside the vehicle. The police canvassed the area around the scene by knocking on doors and speaking with people in the neighborhood. They soon learned that three young men were in the area when the shooting occurred. A witness who lived in a nearby apartment was able to provide the first names of the three individuals. Detective Postiglione explained that they then went to Wilma's apartment. Wilma assisted the police in identifying the three young men and arranged for Pinshon to meet with Detective Postiglione at Wilma's home on March 31, 1998. Pinshon admitted that he witnessed the shooting. Detective Postiglione compiled a photographic line-up from which Pinshon quickly identified the appellant as the shooter. Subsequently, Joe Vaughn gave a statement in which he described the events he witnessed. He also identified the appellant as the shooter.

On April 3, 1998, an arrest warrant was issued for the appellant. Detective Postiglione searched for the appellant in the Nashville area but was unable to locate him. In October 1998, after receiving information that the appellant was incarcerated in Belmont, New York, Detective Postiglione traveled to New York to meet with the appellant. Although the appellant declined to make a statement at that time, he did make several unsolicited comments to Detective Postiglione, asking "what if it was accidental, what if I was there but I didn't do the shooting, what if I was there like an accessory."

Dr. John Gerber, a forensic pathologist, testified that he contracted with Metropolitan Davidson County to do forensic pathology and autopsies. Dr. Gerber reviewed the autopsy

performed on the victim, Melvin Sharp. He concluded that the cause of death was a gunshot wound to the head. He opined that the bullet entered the left side of the victim's head from a distance greater than two feet.

The defense presented the testimony of the appellant's brother, Michael D. Olawumi. Olawumi testified that in January 1998, the appellant began planning a trip to New York. The appellant intended to visit an uncle in New York and relocate there. The appellant planned to leave in late March or early April 1998. Olawumi saw the appellant on March 29 and the appellant left for New York the next day. Olawumi did not know how the appellant traveled to New York, but related that the appellant called home after he arrived. Olawumi admitted that he did not disclose his knowledge of the appellant's travel plans until approximately two weeks before trial.

Jason Scott, the appellant's brother, testified that he met Pinshon while both men were incarcerated at Taft Youth Developmental Center. Scott related that while at Taft he received a letter from the appellant asking him to tell Pinshon to lie to the District Attorney and also not to mention robbery. He also related that Pinshon told him, "[y]our brother is locked up for nothing."

Finally, the defense presented the testimony of David Byrne, an attorney who had represented the appellant for approximately one year. Byrne testified that he attended a meeting which the District Attorney had with Joe Vaughn. Byrne recalled that at that meeting Joe Vaughn stated that he was unable to identify the shooter.

The appellant was convicted of both first degree murder and felony murder, which convictions the trial court merged. The trial court ultimately imposed a sentence of life imprisonment. On appeal, the appellant contends: (1) that the evidence was not sufficient for any rational trier of fact to conclude beyond a reasonable doubt that the appellant was guilty of first degree murder and felony murder; (2) that the trial court erred in overruling the appellant's objection to an instruction of flight; and (3) that the trial court erred in overruling the appellant's objection to the introduction of "gruesome and inflammatory" photographs of the victim.

## II. Analysis
### A. Sufficiency
In order to successfully challenge the sufficiency of the evidence supporting his convictions, the appellant must demonstrate to this court that no "rational trier of fact" could have found the essential elements of the crime beyond a reasonable doubt . Jackson v. Virginia, 443 U.S. 307, 319, 99 S. Ct. 2781, 2789 (1979); State v. Tuggle, 639 S.W.2d 913, 914 (Tenn. 1982); Tenn. R. App. P. 13(e). In other words, on appeal, the State is entitled to the strongest legitimate view of the evidence and all reasonable inferences which may be drawn therefrom. State v. Williams, 657 S.W.2d 405, 410 (Tenn. 1983). Questions concerning the credibility of the witnesses and the weight and value to be given the evidence, as well as all factual issues raised by the evidence, are resolved by the trier of fact and not the appellate courts. State v. Pruett, 788 S.W.2d 559, 561 (Tenn. 1990).

The appellant was charged with one count of first degree murder and one count of felony murder during the perpetration of or attempt to perpetrate robbery. He was convicted of both counts and the trial court correctly merged the convictions. On appeal, the appellant's sole complaint regarding the sufficiency of the evidence is that the only witnesses to the murder were Pinshon and Joe Vaughn. The appellant argues that these witnesses were so unreliable that no rational jury could accredit their testimony. The appellant notes that Pinshon and Joe Vaughn gave inconsistent statements to police regarding their ability to identify the shooter and admitted that at the time of the shooting they had been smoking marijuana.

The jury, as was their prerogative, chose to believe the testimony of the State's witnesses. The inconsistencies in the statements of Pinshon and Joe Vaughn were emphasized to the jury. It is the duty of the jury, not the appellate court, to accept or reject the testimony of witnesses. When the evidence is viewed in the light most favorable to the state, as it must be, we conclude that the evidence is sufficient to support the convictions. Pinshon and Joe Vaughn testified that the appellant approached them and asked for money. Shortly after walking away from them, the appellant walked over to the victim's car and fired one shot, striking the victim in the head. He then walked away from the scene. Both Pinshon and Joe Vaughn identified the appellant from a photographic line-up. Moreover, the appellant attempted to persuade Pinshon to lie about the appellant's involvement in the murder. In a letter the appellant wrote to his brother, Scott, the appellant instructs:

> tell Jeff I need for him to send me a letter and when he write me tell
> him not to say anything about the robbery. Tell him to say that he's
> sorry that he lied about me killing lil buddy. Then tell me everything
> else but leave me and the robbery out. Because that the only way I'm
> going to get out. Tell him when we go to [trial] to say the thing he
> say in the letter when my lawyer gets the chance to talk to him. Tell
> him to tell the D.A. a few lies while he's talking to her.

We conclude that the evidence is sufficient to support the appellant's convictions. This issue is without merit.

### B. Instruction on Flight

Next, the appellant argues that the trial court erred by giving the jury an instruction on flight. The appellant contends that "certain activities such as flight or escape" have traditionally been labeled as "admissions" or circumstances from which guilt may be inferred. Although the appellant concedes that there is "some evidence suggesting flight," he contends that evidence is explained and rebutted by other evidence. The appellant contends that during the trial he presented evidence that his trip to New York had been planned for several months. The appellant's brother, Olawumi, testified at trial that the appellant had planned to visit an uncle in New York and obtain work there. Additionally, Olawumi testified that the appellant regularly called home after arriving in New York. Moreover, Lieutenant Graves testified that he became aware that the appellant was wanted in Nashville only after the appellant informed him that if he checked his computer using another Social Security number, he would discover that the appellant was wanted in Nashville. The appellant argues that his leaving Nashville the day after the murder is not evidence of flight. He

maintains that the length of time between the commission of the offense and his departure is irrelevant.

Following the conclusion of the proof, the trial court used Tennessee Pattern Jury Instruction 42.18, the instruction on flight, specifically charging the jury:

> The flight of a person accused of crime is a circumstance which, when considered together with all the facts of the case, may justify an inference of guilt. Flight is the voluntary withdrawal of oneself for the purpose of evading arrest or prosecution for the crime charged. Whether the evidence presented proves beyond a reasonable doubt that the defendant fled is a question for your determination.
>
> . . . .
>
> If flight is proved, the fact of flight alone does not allow you to find that the defendant is guilty of the crime alleged. However, since flight by a defendant may be caused by a consciousness of guilt, you may consider the fact of flight, if flight is so proven, together with all of the other evidence when you decide the guilt or innocence of the defendant. On the other hand, an entirely innocent person may take flight and such flight may be explained by proof offered, or by the facts and circumstances of the case.

In State v. Smith, 893 S.W.2d 908, 918 (Tenn. 1994), our supreme court addressed the appropriateness of an instruction on flight and concluded that the meaning and weight of such evidence was a question to be determined by the jury. Reviewing a similar charge, this court has stated,

> the flight instruction pointed out to the jury that innocent persons may take flight, and it was up to the jury to determine whether there was flight, the reasons for the flight, and the weight to be given to it. Just as the instruction allowed an inference of guilt from flight, it also instructed that the evidence, facts, and circumstances may show that an innocent person may take flight.

State v. Richardson, 995 S.W.2d 119, 129 (Tenn. Crim. App. 1998).

In the instant case, the evidence showed that the appellant left Nashville the day after the murder. Although Olawumi testified that the appellant called relatives after arriving in New York, he did not know how the appellant traveled to New York or the appellant's specific location in New York. The appellant was aware that he was wanted by authorities in Nashville and did not disclose the information until several months after the offense, during his fourth stay at the jail in Belmont, New York. Moreover, upon his arrest he gave New York authorities a false name. We cannot conclude that the trial court erred in instructing the jury on flight.

C. Admission of Photograph

Finally, the appellant contends that the trial court improperly allowed the admission of a "gruesome and inflammatory" photograph of the victim. Specifically, the appellant alleges that the photograph was "unduly inflammatory, shows a lot of blood, and was pretty gruesome." The State responds that the photograph was relevant to show the "positioning of the body" and to support the State's theory that the door of the car was not opened.

The decision regarding the admissibility of photographs lies within the sound discretion of the trial court and that decision will not be overturned on appeal absent a showing of an abuse of that discretion. State v. Banks, 564 S.W.2d 947, 949 (Tenn. 1978). Photographs which are graphic or even horrifying may be admissible if they are relevant to an issue at trial and if the probative value of such evidence outweighs any prejudicial effect on the jury. State v. Braden, 867 S.W.2d 750, 758 (Tenn. Crim. App. 1993).

The photograph in question, Exhibit 15, shows the victim slumped in the driver's seat of his vehicle with his shoulder against the driver's side door. His face is hidden; however, several large pools of blood cover his shirt. Shattered pieces of glass can be seen in the passenger seat of the vehicle. The photograph supports the State's theory that the victim was shot from the driver's side of the vehicle and the door of the vehicle was not opened. Moreover, an issue at trial was the lack of fingerprints on the driver's side door. The photograph also supports the testimony of Dr. Gerber regarding the manner and cause of death. Finally, we do not find the photograph to be particularly gruesome or inflammatory. Therefore, we conclude that the trial court did not err in allowing the admission of this photograph.

### III. Conclusion

In summary, we conclude that the evidence is sufficient to support the appellant's convictions and that the trial court did not err by instructing the jury on flight or in allowing the introduction of the photograph of the victim. Accordingly, the judgment of the trial court is affirmed.

_____
NORMA McGEE OGLE, JUDGE

-8-