# IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
## AT NASHVILLE
### October 18, 2016 Session

## STATE OF TENNESSEE v. JOE EDWARD DANIELS

**Appeal from the Criminal Court for Jackson County**
**No. 0893    David Earl Durham, Judge**
_____

**No. M2015-01939-CCA-R3-CD – Filed March 16, 2017**
_____

A jury convicted the Defendant, Joe Edward Daniels, of first degree (premeditated) murder. The Defendant was also convicted of certain collateral crimes and traffic offenses, including tampering with evidence, a Class D felony; abuse of a corpse, a Class E felony; failure to give notice of an accident, a Class C misdemeanor; leaving the scene of an accident, a Class C misdemeanor; driving on the wrong side of the road, a Class C misdemeanor; and failure to use due care, a Class C misdemeanor. The Defendant appeals his murder conviction, asserting that the State failed to prove premeditation and that the State's proof regarding the chain of custody of the corpse should have preceded the medical examiner's testimony. The Defendant also claims error in the jury instructions, including the trial court's decision not to charge attempt; the trial court's decision to charge flight; the trial court's inclusion of a charge regarding criminal responsibility and lack of notice regarding that charge; and the trial court's failure to charge facilitation. After a thorough review of the record, we affirm the judgments of the trial court.

**Tenn. R. App. P. 3 Appeal as of Right; Judgments of the Criminal Court Affirmed**

JOHN EVERETT WILLIAMS, J., delivered the opinion of the court, in which NORMA MCGEE OGLE and ROBERT W. WEDEMEYER, JJ., joined.

Comer L. Donnell, District Public Defender; and Thomas H. Bilbrey (at trial and on appeal) and Joe McLerran (at trial), Assistant District Public Defenders, for the appellant, Joe Edward Daniels.

Herbert H. Slatery III, Attorney General and Reporter; Clark B. Thornton, Senior Counsel; Tom P. Thompson, Jr., District Attorney General; and Robert Lee (at hearing on motion for a new trial), James M. Lea, Jr., Robert Hibbett, and Edwin Sadler (at trial), Assistant District Attorneys General, for the appellee, State of Tennessee

**OPINION**

**FACTUAL AND PROCEDURAL HISTORY**

The Defendant was charged in this case after police discovered the corpse of the victim, Walter Greg ("Greg") King, in the woods near the Defendant's wrecked, blood-covered pickup truck. An autopsy revealed that the victim had been shot in the back of the head by a shotgun. The State sought to show at trial that the victim was last seen with the Defendant and that various pieces of physical evidence tied the Defendant to the crime. The Defendant sought to establish through his wife's testimony that the victim had been shot by the Defendant's uncle in the heat of passion during a struggle for a gun.

On August 19, 2008, the victim resided at the Cherry Tree apartment complex in Celina, Tennessee. Robert Kevin Sloan performed maintenance for the apartment complex and was a friend of both the victim and the Defendant. Mr. Sloan testified that the victim was disabled as the result of a car accident that had left him in a coma for several months. The victim walked with a cane and had difficulty moving around. Mr. Sloan described the victim as clean-cut and neat, and he testified that the victim had one tattoo on his arm and another on his forearm. Marion Beck and Theresa Vincent, who also lived at the complex, confirmed that the victim had difficulty walking, and Ms. Beck stated the victim used a cane or held onto things when he walked.

The Defendant, his wife, and his sons also lived at the apartment complex. Mr. Sloan testified that on August 19, 2008, the Defendant was in the process of moving out of his apartment. Mr. Sloan was painting the apartment as the Defendant and his wife cleaned and moved furniture into a residence across the street; the Defendant's children were playing in the parking lot. Mr. Sloan testified that the victim and Defendant were "somewhat" friends, and he stated that on that day, the two were sitting on the porch together. The Defendant and victim went two or three times in the Defendant's white Ford pickup truck to get beer and cigarettes, and Mr. Sloan, the Defendant, and the victim each drank approximately four to six beers. The victim and the Defendant returned from their second trip at around 3:00 p.m. The last time Mr. Sloan saw the victim, the victim told him that "they were going to make another beer run." Mr. Sloan saw the Defendant and victim leave in the Defendant's truck and never saw the victim again.

Mr. Sloan acknowledged that he had been an alcoholic at the time and probably drank twelve or more beers that day, and he acknowledged that he was probably drinking when he spoke to police the next day. Mr. Sloan also acknowledged telling police that he did not think the victim left with the Defendant but believed he left with a man with a tattoo on his neck and a ponytail. He explained that he did see the man with the tattoo

"come in and out of the store where [the Defendant's] wife worked." He also explained that at the time he made this statement, he thought the Defendant's truck was sitting at the Defendant's brother's house but he later realized that the truck at the Defendant's brother's house did not belong to the Defendant. It was instead a similar truck that could be distinguished because it had a tire in the bed whereas the Defendant's truck did not. Mr. Sloan testified he later told police he was mistaken about the truck's location.

Ms. Beck and Ms. Vincent also testified to last seeing the victim with the Defendant at the apartment complex. Ms. Beck stated that she saw the Defendant and victim leaving together around dusk or dark. The Defendant was driving a white truck and the victim was a passenger. Ms. Beck never saw the victim alive again. Ms. Vincent testified that the victim came to her home for coffee in the morning. The victim stopped in again when Ms. Vincent's daughter was home. Ms. Vincent testified that based on her daughter's work schedule, the victim's second visit must have been at noon or at 3:00 p.m. Ms. Vincent was lying on the couch with her eyes closed, and the victim took her to be asleep and told her daughter he would be "back in a few minutes." Ms. Vincent looked out of the window and saw him get into the passenger's side of a pickup truck she recognized as the Defendant's truck. She only saw the driver's arm and cap and testified she could not be sure the driver was the Defendant. She acknowledged telling police that the driver was the Defendant and explained that she inferred the Defendant was the driver because it was his truck and she had not seen anyone else drive it. At trial, Ms. Vincent testified that she could not recall if it was the Defendant's white or red pickup truck that they left in, but stated that if she had at the time told police that it was a white truck, her statement would be correct.

At 10:45 p.m. on August 19, 2008, Trooper Edwin Crouch was called to examine a wrecked vehicle on Sugar Creek Road. The vehicle was a white Ford pickup truck which had gone down an embankment. Skid marks on the roadway and through the rock indicated the path the truck had taken. The driver was not with the vehicle. Trooper Crouch noticed "a lot" of blood on the tailgate of the truck and in the bed, and he saw fingerprints and hand prints in the blood on the car. Because the truck was registered to the Defendant, Trooper Crouch tried to locate the Defendant at hospitals and at his last known address, where he was no longer living. The Defendant was not at the scene and did not notify police of the accident. The truck was put in a secured, indoor facility by the towing company. Trooper Crouch acknowledged that the wreck looked like someone "just missed the curve." A video of the scene was introduced into evidence but is not part of the appellate record.

The next day, at approximately 6:00 or 6:30 p.m., Lisa Bybee was riding her bicycle on Sugar Creek Road. She saw two dogs at the side of the road, and she noticed that one was near a corpse which was about twenty-five feet from the road. She rode

home, called 911, and returned in her vehicle to direct emergency personnel to the area with the body. Ms. Bybee testified that the body was near the old bridge and near the house of Robert Daniels, who was identified in other testimony as the Defendant's uncle.

Agent Jason Wilkerson with the Tennessee Bureau of Investigation ("TBI") responded to the discovery of the victim's body. Agent Wilkerson testified that the body was approximately 300 yards from the Defendant's wrecked truck. There was blood in the roadway above the body and major trauma to the victim's head, along with "scavenger activity." Agent Wilkerson described the victim's body as a Caucasian male lying face down nineteen feet off the road down an embankment. His body was nude, but there was a shirt wrapped around his waist. Agent Wilkerson collected evidence from the site, including a pair of bloody shorts found near the body and two swabs taken from the reddish brown substance in the roadway above the body. He also collected a baseball cap, bottle, lighter, and blood-speckled leaves near the site of the wreck. Agent Wilkerson had the white truck put inside a trailer and moved to the TBI for analysis. Trooper Crouch, who returned to the scene, testified that the body appeared as though it had been dragged because of the way the feet were lying and the shirt was rolled down. Agent Shannon Brown measured and documented the scene and testified that the corpse and vehicle were found near a residence belonging to the Defendant's uncle, Robert Daniels.

Agent Wilkerson tried to contact the Defendant, who was in Indiana. The Defendant's wife called Agent Wilkerson a number of days after the body was found and said that the Defendant would meet with him. Agent Wilkerson met the Defendant and his wife at a highway patrol station, and the Defendant claimed he had not been driving the truck at the time of the homicide and did not know what happened to the victim. The Defendant told Agent Wilkerson, "[I]f I did know what happened, I would be afraid to say. I have four boys and I don't want what happened to Greg to happen to them."

Agent Wilkerson took DNA samples from the Defendant and his wife and took the Defendant's fingerprints. He also retrieved fingerprints taken from the victim by the medical examiner. He acknowledged that the Defendant's uncle, Robert Daniels, was also charged in connection with the murder and that a case against Mr. Daniels was pending.

Jim Morgan, the Jackson County coroner, testified that the victim's body was found fifteen to twenty feet from the road. At first, responders believed the body originated from the wreck, but Mr. Morgan questioned that conclusion based on large wounds to the head and neck. He ordered an autopsy and arranged transportation to Nashville, but he did not take the body there himself.

The State called Dr. Amy McMaster, a forensic pathologist, and the defense objected to the State's introduction of the testimony of Dr. McMaster based on a failure to prove the chain of custody of the body. The trial court stated that it would wait until the close of proof to rule on the Defendant's motion, noting that the State could introduce further evidence to bolster the chain of custody.

Dr. McMaster testified that she performed the autopsy on the victim on August 21, 2008. The victim's toxicology results showed that he had anti-seizure medication, two anti-depressants, and alcohol in his system at the time of death. She testified that the alcohol level in his urine, which was .22 percent, would not necessarily correlate to his blood alcohol level. The victim's body was beginning to decompose and suffered from "postmortem carnivore activity" around the head and neck. However, she was able to determine that he had a large, round "defect" on the back left of his skull due to a shotgun wound. Dr. McMaster recovered birdshot pellets from his skull and brain. The hole in the victim's head was well-defined, and she estimated that the gun was fired within a few feet. She stated that no soot was visible and that the shot was most likely fired from closer than ten feet. She stated that the type of "wound pattern" suffered by the victim could be produced during a struggle. Defense counsel asked Dr. McMaster, "And if a person – if a gun is being pointed at them and they turn their head then it would hit right in that area, wouldn't it?" However, Dr. McMaster disagreed, stating that "those two scenarios are, in my opinion, mutually exclusive," elaborating that she believed that the victim's wound was inconsistent with a struggle for the gun. Dr. McMaster testified that the path of the wound was left to right and slightly back to front. She determined that the manner of death was homicide.

Agent Wilkerson, testifying after Dr. McMaster, stated that he recognized the body at the autopsy as the one from the road based on height, weight, state of decomposition, and tattoos. After Dr. McMaster's testimony, the State presented the testimony of Jeff Davenport, a paramedic who transported the body from Sugar Creek Road to the Emergency Medical Services Center. He stated that he left the body at the center and that he believed Mr. Morgan was there at the time. Brian Horton testified that he received paperwork from Mr. Morgan and that he then transported the body from the Ambulance Service to the medical examiner's office in Nashville. Agent Hunter Greene of the TBI testified that the fingerprints of the deceased taken by the medical examiner matched the known prints of the victim.

Agent Greene also conducted fingerprint analysis on the white truck. She recovered five latent prints that were of value from the truck. The Defendant's right palm print appeared twice on the tailgate. His left middle fingerprint was on the driver's side, and his right palm and left thumbprint were on the passenger's side. One of the palm prints was in the same area that was the source of a blood sample which contained the

victim's DNA. Agent Greene testified that blood would "pretty much" cover pre-existing fingerprints on a surface. After examining the patterns of the fingerprints in the blood, she concluded that the blood in the fingerprints was on the Defendant's hand first and was then transferred to the truck when he touched the surface.

Agent Patrick Ihrie of the TBI examined the DNA samples submitted by Agent Wilkerson. Agent Ihrie testified that the two blood swabs from the road, the blood on the shorts, and the blood on the leaves near the crash site contained the victim's DNA. The victim's DNA was also found on the tailgate of the white truck, in two samples taken from the bed of the truck, and in a spot of blood below the driver's armrest in the truck's interior. Agent Ihrie could only obtain a partial DNA profile from the hat found near the crash site. The DNA he found was a mixture from two individuals. The major contributor was consistent with the Defendant's DNA, and the Defendant's wife could not be excluded as the minor contributor.

The Defendant's wife, Kim Daniels did not appear when first summoned, and the State presented her testimony as that of a hostile witness. Ms. Daniels testified in support of the Defendant's claim that the victim was shot by someone else, was shot by accident, and was shot in the heat of passion.

Ms. Daniels had been married to the Defendant for ten years at the time of trial, and they had four children together. On August 19, 2008, Ms. Daniels went to Jamestown on an errand with three children: an infant, a two-year-old, and a four-year-old. Ms. Daniels's car had a flat tire, and she got a ride from a stranger to her destination, where she called the Defendant to help her. She acknowledged that she was upset that the Defendant was drinking that day. The Defendant and victim fixed the tire and then took her and the children to the car. She rode with the baby in the passenger's seat, and the two young boys and the victim rode in the bed of the truck. The Defendant and the victim left after they returned to Celina, and she never saw the victim again.

Ms. Daniels testified that the Defendant came home in the middle of the night with a cut on his forehead and asked her to clean the cut. He said he was going to his sister's home in Indiana. She did not recall telling Agent Wilkerson that he told her he had "messed up." On August 20th, the Defendant called her to ask if his truck was back. He instructed her to report it stolen, and she did so. Ms. Daniels met with the Defendant in Indiana about two days after the victim's death. There, the Defendant told her his version of events.

According to what the Defendant's wife testified he told her, the Defendant and victim went to the house of the Defendant's uncle, Robert Daniels, and the three were drinking and began discussing sex. The Defendant told his wife that the victim asked

- 6 -

them if they had "ever messed around with a boy before, and they said, no." The Defendant's wife testified:

> And I don't remember exactly what all he said was said, but then Greg said that he had – Greg expressed like an interest in our son …, and then Bob got angry and went in his house and got a gun and loaded it, and Greg said he didn't have the nerve, and Bob put the gun up to his head and they all three struggled over it and it discharged.

Ms. Daniels clarified that the Defendant had told her that his uncle, Robert Daniels, had the gun when it went off and that the Defendant told her that he did not have the gun. She also testified that she told the TBI that approximately one week before the shooting, the couple's children were missing and the Defendant found them at the victim's house. She testified that her son was four at the time.

Ms. Daniels acknowledged that she and the Defendant went to Kentucky, where they registered under a false name at a motel. Eventually, she took the Defendant to meet a TBI agent at a highway patrol station. She acknowledged that she "might have" told Agent Wilkerson that the Defendant told her "that he took the body and he put it in the back of his truck and then he dumped the body and then he had a wreck and then he went back across the creek to his Uncle Bob's house."

The State tried to elicit testimony from Ms. Daniels regarding prior statements she had made to law enforcement regarding the Defendant's suspicions that the victim and Ms. Daniels were having an affair. Ms. Daniels denied telling Agent Wilkerson that the Defendant accused her of having an affair with the victim or with Mr. Sloan based on a hair he found in the bathroom. She did not recall telling Agent Wilkerson that the Defendant asked, "[D]id I bring the right boyfriend with me?" when he came to get her in Jamestown. She did not recall telling Agent Wilkerson that the Defendant again accused her of having an affair with the victim when they returned to Celina before the victim and Defendant went to get beer. She denied that the victim had ever shown romantic interest in her.

After Ms. Daniels denied making the statements to Agent Wilkerson, the State sought to introduce a recording of her interview with Agent Wilkerson. The defense objected based on hearsay statements that the Defendant's uncle made to Ms. Daniels and that she relayed to Agent Wilkerson and based on statements not relevant as impeachment. In allowing a partial recording to be played, the trial court noted that it was not being offered for the truth of the matter asserted but for impeachment under Tennessee Rule of Evidence 613, and the court ruled that the recording would not be made an exhibit for the jury to have during deliberations. None of the exhibits are a part

of the record on appeal, but portions of the interview were played for the jury. The trial court instructed the jury that the recording was "evidence of a prior statement," that the jury should "give it what weight, credibility, truthfulness, … you decide when you get back in that jury room," and that the jury would be given further instructions at the end of trial. The trial court instructed the jury after the close of proof that a witness may be impeached with prior statements that vary materially from the witness's testimony, and that "proof of such prior inconsistent statements may be considered by you only for the purpose of testing the witness' credibility and not as substantive evidence of the truth of the matter asserted in such statements."

During trial, the parties discussed jury instructions with the court, and the prosecution noted that it did not believe attempt should be charged because the victim was deceased. Defense counsel stated that he "could conceive" of a case where the defendant attempts to kill the victim but the victim dies by another hand, although counsel acknowledged he was "not saying this case will be one." The trial court essentially expressed a belief that failure to charge a lesser-included offense could never be reversible error when the defendant was convicted of the greater offense due to the fact that the jury was instructed to acquit on the greater offense prior to considering the lesser. The trial court asked the defense if it had any objections to the decision not to charge attempt, and the defense responded that it did not.

After the close of proof, the prosecutor asked the court to instruct the jury on flight. The defense conceded that there had been "some evidence" of flight but argued that flight should not be charged because of the Defendant's voluntary return. The trial court charged the jury that the flight of a person accused of a crime may justify an inference of guilt.

The prosecution also at this point asked the trial court to charge the jury with criminal responsibility. The prosecution reasoned that the Defendant's wife, who was the last witness due to the fact that she did not appear on the day she was scheduled to testify, had introduced a theory that the Defendant's uncle was the one who pulled the trigger during the shooting of the victim. The Defendant objected to the instruction on criminal responsibility, but the prosecution argued that the proof from the Defendant's wife justified the instruction. The jury was instructed on criminal responsibility.

The jury found the Defendant guilty of first degree murder, tampering with evidence, and abuse of a corpse. *See* T.C.A. §§ 39-13-202(a)(1); 39-16-503(a)(1); 39-17-312(a)(1). The jury also convicted the Defendant of four traffic violations: failure to give notice of an accident, leaving the scene of an accident, driving on the wrong side of the road, and failure to use due care. *See* T.C.A. §§ 55-10-106(a), 55-10-102, 55-8-120(a), 55-8-136(b). The Defendant was acquitted of a violation of the seat belt law. *See* T.C.A.

§55-9-603. The Defendant received a life sentence for the murder conviction. The trial court approved agreed-upon sentences for the other convictions as follows: a three-year sentence for tampering with evidence; a one-year sentence for abuse of a corpse; and a thirty-day sentence for each of the traffic offenses. All the sentences were to be served concurrently.

The Defendant's motion for a new trial was denied, and he appeals.[1]

## ANALYSIS

On appeal, the Defendant challenges the sufficiency of the evidence supporting a finding of premeditation in his murder conviction. He also premises error on the failure to establish the chain of custody prior to the testimony of the medical examiner. The Defendant raises several challenges to the jury instructions, including the trial court's failure to charge attempted first or second degree murder, the charge regarding flight, the charge regarding criminal responsibility, and failure to charge facilitation as a lesser-included offense.

## I. Sufficiency of the Evidence

The Defendant raises several arguments regarding the weight of the evidence which are essentially challenges to the sufficiency of the evidence supporting the convictions. In particular, the Defendant argues that the State failed to prove premeditation and that the State failed to prove the elements of criminal responsibility. We address the sufficiency argument regarding criminal responsibility separately below.

Under Tennessee Rule of Appellate Procedure 13(e), "[f]indings of guilt in criminal actions whether by the trial court or jury shall be set aside if the evidence is insufficient to support the finding by the trier of fact of guilt beyond a reasonable doubt." The question before the appellate court is whether, after reviewing the evidence in the light most favorable to the State, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt. *State v. Pope*, 427 S.W.3d 363, 368 (Tenn. 2013). When the defendant challenges the sufficiency of the evidence, the appellate court may not reweigh the evidence or substitute its inferences for those drawn by the trier of fact. *State v. Smith*, 24 S.W.3d 274, 279 (Tenn. 2000). A jury's verdict of guilt, approved by the trial court, resolves conflicts of evidence in the State's favor and accredits the testimony of the State's witnesses. *State v. Smith*, 436 S.W.3d 751, 764

---

[1] For reasons that are not explained in the record, the motion for a new trial was not heard until almost five years after the May 2010 trial. A different judge presided over the hearing and denied the motion.

(Tenn. 2014).  "Questions concerning the credibility of witnesses, the weight and value to be given the evidence, as well as all factual issues raised by the evidence are resolved by the trier of fact."  *State v. Bland*, 958 S.W.2d 651, 659 (Tenn. 1997).  The State is entitled to the strongest legitimate view of the evidence and to all reasonable and legitimate inferences that can be drawn from it.  *State v. Goodwin*, 143 S.W.3d 771, 775 (Tenn. 2004).  A guilty verdict replaces the presumption of innocence with one of guilt, and on appeal, the defendant bears the burden of demonstrating that the evidence is insufficient to support the conviction.  *State v. Cole*, 155 S.W.3d 885, 897 (Tenn. 2005).  The elements of an offense may be established exclusively by circumstantial evidence, and the standard of review is the same for direct and circumstantial evidence.  *State v. Echols*, 382 S.W.3d 266, 283 (Tenn. 2012).  Circumstantial evidence may, by itself, support a conviction, and the State is not required to exclude every reasonable hypothesis save guilt.  *State v. Hawkins*, 406 S.W.3d 121, 131 (Tenn. 2013).

The Defendant argues that the only evidence regarding the actual shooting came from the Defendant's wife and that her testimony shows that the Defendant did not kill the victim and that, if he was in any way involved in the death, he was not sufficiently free from passion to support a finding of premeditation.

The Defendant was convicted of first degree murder, which as charged here is a "premeditated and intentional killing of another."  T.C.A. § 39-13-202(a)(1).  A premeditated act is one "done after the exercise of reflection and judgment."  *Id.* § 39-13-202(d).  Premeditation requires a finding that "the intent to kill must have been formed prior to the act itself," but "[i]t is not necessary that the purpose to kill preexist in the mind of the accused for any definite period of time."  *Id.*  The statute also specifies that "[t]he mental state of the accused at the time the accused allegedly decided to kill must be carefully considered in order to determine whether the accused was sufficiently free from excitement and passion as to be capable of premeditation."  *Id.*

Premeditation is a question of fact for the jury's determination.  *State v. Davidson*, 121 S.W.3d 600, 614 (Tenn. 2003).  It may be established by any evidence which could lead a rational trier of fact to infer that the killing was done after the exercise of reflection and judgment, including circumstantial evidence.  *Id.* at 614-15.  Courts frequently look to the circumstances surrounding a killing to discern the presence of evidence sufficient to support a finding of premeditation.  *State v. Larkin*, 443 S.W.3d 751, 815 (Tenn. Crim. App. 2013).  "Although a jury may not engage in speculation, it may infer premeditation from the manner and circumstances of the killing."  *State v. Jackson*, 173 S.W.3d 401, 408 (Tenn. 2005).

Factors which tend to support the existence of premeditation include: the use of a deadly weapon upon an unarmed victim; the particular cruelty of the killing; declarations

by the defendant of an intent to kill; evidence of procurement of a weapon; preparations before the killing for concealment of the crime, and calmness immediately after the killing. *State v. Bland*, 958 S.W.2d 651, 660 (Tenn. 1997). The factors listed in *Bland* are not exhaustive, however. *State v. Adams*, 405 S.W.3d 641, 663 (Tenn. 2013). The nature of the killing or evidence establishing a motive for the killing may also support a conclusion that the crime was premeditated. *Id.* Mutilation of the body may show that a killing was not rash or impulsive. *Davidson*, 121 S.W.3d at 615. Lack of provocation by the victim, failure to render aid, and destruction or secretion of evidence may also support an inference of premeditation. *Larkin*, 443 S.W.3d at 815-16 (citing *State v. Thacker*, 164 S.W.3d 208, 222 (Tenn. 2005); *State v. Lewis*, 36 S.W.3d 88, 96 (Tenn. Crim. App. 2000)).

The Defendant notes that neither concealment of the crime nor use of a weapon on an unarmed victim may, standing alone, support premeditation. He argues that while the jury may disregard evidence presented by the Defendant, it cannot reach conclusions unsupported by any evidence, and he contends that premeditation here is unsupported by evidence.

In *State v. Jackson*, the Tennessee Supreme Court concluded that there was insufficient evidence to support premeditation. *Jackson*, 173 S.W.3d at 410. In that case, as in this one, the unarmed victim was shot in the back of the head, and the defendant then hastily disposed of the body. *Id.* at 405 (noting that defendant put the body in the trunk of the victim's vehicle and abandoned the vehicle). The defendant in *Jackson* claimed that he shot when he thought the victim was reaching for a gun. *Id.* The conviction for first degree premeditated murder was overturned on appeal because the only *Bland* factor present was the use of a deadly weapon on an unarmed victim. *Id.* at 409. This court further concluded that the concealment of a crime was not alone sufficient to establish premeditation. *Id.* (citing *State v. West*, 844 S.W.2d 144, 148 (Tenn. 1992)). The court noted that "the defendant attempted to conceal commission of the crime, but his sloppy incomplete efforts actually appear to undercut rather than support premeditation." *Id.* at 410.

Here, the State introduced proof that the victim, who was handicapped and had difficulty walking, was drinking with the Defendant for the bulk of the day, apparently peaceably. The Defendant did not have a weapon with him. At some point, the two left and did not return. The victim was shot in the back of the head by a shotgun from "a few" feet away. There was no soot around the wound, and the medical examiner opined that the wound was inconsistent with a struggle because of its location on the back of the victim's head. The victim was stripped down at some point either prior to or after the shooting. The Defendant apparently took the victim's body in the bed of his pickup truck and dumped it off an embankment. The victim was discovered nude, with a shirt

wrapped around his waist and a pair of bloody shorts nearby. The Defendant returned to his home, asked his wife to bandage a cut, and left the state. He later told his wife to report his truck as stolen. The Defendant told his wife a few days later that the victim was shot by the Defendant's uncle during a struggle after the victim made a sexual comment about the Defendant's four-year-old son. When he turned himself in, the Defendant told police that he had not been driving the truck and that he could not tell them about the victim's death because he feared for the safety of his children.

In analyzing the sufficiency of the evidence, we address briefly the evidence in the record that the Defendant was motivated by a belief that his wife was having an affair with the victim, which the State asserts supports a finding of premeditation. We note that Ms. Daniels's testimony cannot establish that the Defendant believed his wife was romantically involved with the victim, because she denied making any statements that could support that conclusion. The trial court allowed the jury to hear the recording of Ms. Daniels's interview with Agent Wilkerson, relying on Tennessee Rule of Evidence 613(b), which permits extrinsic evidence of a prior inconsistent statement after the witness has been given the opportunity to explain or deny the statement. We note that, prior to the Defendant's trial, the Tennessee Rules of Evidence were amended to permit certain evidence of prior inconsistent statements to be admitted as substantive evidence. Tenn. R. Evid. 803(26). To qualify, the statement must be admissible under Rule 613, the declarant must be testifying at trial and subject to cross-examination, and the statement must be an audio or video recording, signed statement, or statement made under oath. Tenn. R. Evid. 803(26)(A), (B). The trial court must further hold a jury-out hearing to determine whether the statement was made under circumstances indicating trustworthiness. Tenn. R. Evid. 803(26)(C). While the trial court appeared to admit recordings of the statements only for impeachment purposes, it did not tell the jury at the time the recording was played that it should not consider the statements as substantive evidence. Instead, the court told the jury that the recording was evidence of a prior statement and that the jury would be further instructed. The jury was instructed that evidence of an out-of-court statement inconsistent with witness testimony should not be considered for its substantive value but only as it might affect the witness's credibility. The Defendant does not raise any issue with the admission of the recording, which we note is missing from the record on appeal. We conclude that the statements were not admitted as substantive evidence, and that there is accordingly no evidence in the record that the Defendant was motivated to kill the victim due to jealousy over the victim's relationship with the Defendant's wife.

We examine the remaining evidence to determine if there is sufficient evidence to support a finding of premeditation beyond a reasonable doubt. The unarmed victim was shot with a deadly weapon. Furthermore, the victim was shot in the back of the head in such a manner that the medical examiner opined that the wound and a struggle were

- 12 -

"mutually exclusive." The Defendant did not have a shotgun with him when he and the victim spent time together that day, and the weapon must have been procured after the two left the apartment complex. After the killing, the Defendant, and not his uncle, took several steps to conceal the body and to try to cover up his role in the killing, including throwing the corpse down an embankment and asking his wife to report his vehicle as stolen. The Defendant fled the jurisdiction. We further note that the victim's body was unclothed. The Defendant then denied his involvement to police while hinting at risks to his family's safety. The Defendant's version of events was that the victim made a sexual comment about the Defendant's small child and that the Defendant's uncle retrieved a gun which discharged during a struggle. The jury was free to disregard the Defendant's version of events, which did not explain why the victim was nude and which was inconsistent with the testimony of the medical examiner. The jury was also at liberty to believe only part of the Defendant's version, that the victim made a comment about his son which caused the Defendant to kill him. While the evidence supporting premeditation is certainly not overwhelming, the circumstances of the victim's shooting, including the wound to the back of the head, the type of weapon used, the fact that the Defendant must have procured the weapon at some point prior to the shooting, the use of a deadly weapon on an unarmed victim, the fact that the corpse was unclothed, the medical examiner's opinion that the wound was not received during a struggle, and the Defendant's attempts to conceal the crime are sufficient to uphold the finding of premeditation.

The Defendant does not challenge the sufficiency of the evidence upholding his other convictions. We note that the Defendant has presumably finished serving these sentences, and we conclude that the evidence is sufficient to uphold the first degree murder conviction.

## II. Chain of Custody

The Defendant also asserts that the State failed to prove the chain of custody of the victim's corpse. He challenges the trial court's decision to allow the testimony of Dr. McMaster prior to the testimony of the paramedics which established that the body was transported to Nashville for an autopsy, and he argues that the testimony should not have been admitted until the corpse was identified as the body found near the truck. The Defendant cites no legal authority for the proposition that hearing the proof in this order was error, and we agree with the State that the argument is waived under Rule 10(b) of the Rules of the Court of Criminal Appeals. Tenn. Ct. Crim. App. R. 10(b) ("Issues which are not supported by argument, citation to authorities, or appropriate references to the record will be treated as waived in this court.").

- 13 -

Moreover, we note that a challenge to the chain of custody under Tennessee Rule of Evidence 901 applies only to tangible evidence. *See State v. Cannon*, 254 S.W.3d 287, 296 (Tenn. 2008) (noting that a condition precedent to the introduction of *tangible evidence* is the witness's ability to identify it or establish a chain of custody); *State v. Jeremy McMillon*, No. E2010-01091-CCA-R3-CD, 2011 WL 4424732, at *8 (Tenn. Crim. App. Sept. 22, 2011) ("In the case herein, the bullet at issue was never actually entered into evidence …. Therefore, the bullet itself is not tangible evidence …, and there was no need for authentication."); *compare State v. McKinney*, 605 S.W.2d 842, 845 (Tenn. Crim. App. 1980) (analyzing chain of custody of blood sample up to time of testing). In this case, the body itself was not introduced into evidence.

While Dr. McMaster's testimony may have been subject to exclusion based on relevance had the State not established that the autopsy in question was performed on the body found near the crash site, the State introduced abundant evidence on this issue, including the testimony of the two paramedics that they transported the body first to the coroner and then to the medical examiner, the testimony of Agent Wilkerson that he could identify the body at the autopsy as the one recovered from the roadside based on its physical state and the deceased's tattoos, and evidence that the known fingerprints of the victim matched those of the corpse. *See State v. Goodman*, 643 S.W.2d 375, 381 (Tenn. Crim. App. 1982) (rejecting challenge based on chain of custody to expert testimony regarding corpse when experts testified regarding the "distinct characteristics of this corpse, as compared to the other corpses being examined at the UT Hospital"); Donald F. Paine, et al., *Tennessee Law of Evidence* § 9.01[13][f] (6th Ed. 2011) (noting that "courts apply a reasonableness standard" in evaluating chain of custody and that the establishment of the chain of custody "varies according to the type of evidence and other facts in the case."). Under Rule 104 of the Tennessee Rules of Evidence, when the relevance of evidence depends on the establishment of a fact, "evidence may be admitted subject to subsequent introduction of evidence sufficient to support a finding of the fulfillment of the condition." Tenn. R. Evid. 104(b). Dr. McMaster's testimony was properly conditionally admitted pending further evidence that the corpse upon which the autopsy was conducted was that which was found at the roadside. Accordingly, we observe no error.

### III. Jury Instructions

The Defendant challenges various jury instructions, including the omission of an instruction on attempted first and second degree murder, the inclusion of a flight instruction, the inclusion of an instruction on criminal responsibility, and the omission of a facilitation instruction. Generally, the trial court has a duty to give a correct and complete charge of the applicable law. *State v. Garrison*, 40 S.W.3d 426, 432 (Tenn. 2000). The right to a correct and complete charge is constitutional, and each issue of fact

raised by the evidence should be submitted to the jury with proper instructions. *State v. Dorantes,* 331 S.W.3d 370, 390 (Tenn. 2011). A jury charge should contain no statement which is inaccurate, inapplicable, or which might tend to confuse the jury. *State v. Hatcher*, 310 S.W.3d 788, 812 (Tenn. 2010). Jury instructions must be reviewed in their entirety, and no phrase is examined in isolation. *State v. Rimmer*, 250 S.W.3d 12, 31 (Tenn. 2008). Whether a jury instruction is required by the facts of a particular case is a mixed question of law and fact. *State v. Hawkins*, 406 S.W.3d 121, 128 (Tenn. 2013). The question of whether a jury instruction should have been given is accordingly reviewed de novo with no presumption of correctness. *Id.*

### A. Attempted First and Second Degree Murder

The Defendant challenges the trial court's decision not to charge the jury with attempted first or second degree murder. The accused may be charged with attempt to commit an offense when, acting with the culpability otherwise required for the offense, the accused:

> (1) Intentionally engages in action or causes a result that would constitute an offense, if the circumstances surrounding the conduct were as the person believes them to be;

> (2) Acts with intent to cause a result that is an element of the offense, and believes the conduct will cause the result without further conduct on the person's part; or

> (3) Acts with intent to complete a course of action or cause a result that would constitute the offense, under the circumstances surrounding the conduct as the person believes them to be, and the conduct constitutes a substantial step toward the commission of the offense.

T.C.A. § 39-12-101(a). The fact that the offense was actually completed is "no defense to prosecution for criminal attempt. *Id.* § 39-12-101(c). Rather than citing to authority to support the proposition that attempt should have been charged, the Defendant cites to *State v. Banks*, 271 S.W.3d 90, 127 (Tenn. 2008), for the proposition that it is unnecessary to charge attempt when the proof establishes only the completed crime. This claim is arguably waived for failure to cite supporting authority. Tenn. Ct. Crim. App. R. 10(b) ("Issues which are not supported by argument, citation to authorities, or appropriate references to the record will be treated as waived in this court."). Moreover, when the trial court indicated that it would not charge attempt based on the fact that the victim was deceased, defense counsel at first objected, noting that it was conceivable that the accused, after having attempted but failed at the murder, could see the completion of the

offense by another hand.  Defense counsel, however, stated that he was "not saying this case" would fit that pattern.  Defense counsel was, after a brief discussion, given an opportunity to object to the trial court's decision not to charge attempt, and he explicitly declined to do so.  We conclude that the issue is waived.  T.C.A. § 40-18-110(c) (Supp. 2010) ("Absent a written request, the failure of a trial judge to instruct the jury on any lesser included offense may not be presented as a ground for relief either in a motion for a new trial or on appeal."); Tenn. R. App. P. 36(a) ("Nothing in this rule shall be construed as requiring relief be granted to a party responsible for an error or who failed to take whatever action was reasonably available to prevent or nullify the harmful effect of an error."); *State v. Page*, 184 S.W.3d 223, 229 (Tenn. 2006) ("[I]f a defendant fails to request an instruction on a lesser-included offense in writing at trial, the issue will be waived for purposes of plenary appellate review and cannot be cited as error in a motion for a new trial or on appeal.").

In any event, the Tennessee Supreme Court has held that "where the evidence clearly establishes the completion of the crime, it is unnecessary for the trial court to charge the jury as to attempt or solicitation."  *Banks*, 271 S.W.3d at 127; *see also State v. Marcum*, 109 S.W.3d 300, 304 (Tenn. 2003) (concluding that failure to charge attempt was not error when the proof was susceptible to only two interpretations: that the offense occurred or that it did not).  The trial court is required to charge a lesser included offense only when "the judge determines that the record contains any evidence which reasonable minds could accept as to the lesser included offense."  T.C.A. § 40-18-110(a).  Because "[i]t is no defense to prosecution for criminal attempt that the offense attempted was actually committed," T.C.A. § 39-12-101(c), a conviction for attempt can stand even when the proof establishes completion of the crime.  *State v. Thorpe*, 463 S.W.3d 851, 863 (Tenn. 2015).  However, *Thorpe* specifically distinguished cases concerning "a challenge to the *inclusion* of the attempt instruction, rather than the *omission* of the instruction." *Id.* at 861.

Here, there was uncontroverted evidence that the victim was killed as the result of a shotgun wound to the back of the head.  There was no evidence in the record to support the Defendant's speculation that the jury "might have found" that the Defendant attempted to kill the victim but was beaten to the punch by his uncle.  Instead, the State's theory was that the Defendant shot the victim in the back of the head, stripped him either before or after the crime, and disposed of his body down an embankment, while the Defendant's theory was that the Defendant's uncle, acting under provocation, shot the victim in a struggle over a shotgun.  We conclude that, under *Banks*, the evidence established only a completed crime, and there was no error in the trial court's decision not to charge attempt.

## B. Flight

The Defendant also asserts error in the flight instruction, although he "concede[s] that under existing Tennessee law, flight was properly charged." The Defendant argues that other jurisdictions have cast doubt on the probative value of flight on the question of guilt, and he cites to *Ramsey v. State* for the proposition that if "flight be construed as an act of guilt," then "voluntary return must be treated as an act of innocence." 571 S.W.2d 822, 827 (Tenn. 1978) (Henry, C.J., dissenting).

Flight or attempted flight may bear on the defendant's intent, purpose, or consciousness of guilt and may connect the accused with the commission of the offense. *Rogers v. State*, 455 S.W.2d 182, 186 (Tenn. Crim. App. 1970). When the jury is presented with evidence of flight, it may draw an inference of guilt after considering the circumstances of flight in the absence of an explanation of the "reasons or motive" for the flight. *Id.* at 187 (quoting 22A C.J.S. Criminal Law § 625). Flight requires both a leaving of the scene and a subsequent act indicative of an intent to flee:

> The law makes no nice or refined distinction as to the manner or method of a flight; it may be open, or it may be a hurried or concealed departure, or it may be a concealment within the jurisdiction. However, it takes both a leaving the scene of the difficulty and a subsequent hiding out, evasion, or concealment in the community, or a leaving of the community for parts unknown, to constitute flight.

*Dorantes*, 331 S.W.3d at 388 n.16 (quoting *Rogers,* 455 S.W.2d at 187). "Evidence of flight to avoid arrest may be rebutted by a credible explanation of some motive other than guilt, but the conclusion to be drawn from such evidence is for the jury upon proper instructions from the trial court." *Hall v. State*, 584 S.W.2d 819, 821 (Tenn. Crim. App. 1979). In order for the flight instruction to be warranted, sufficient evidence must exist to support the instruction. *State v. Berry,* 141 S.W.3d 549, 588 (Tenn. 2004) (appendix).

In *State v. Payton*, this court acknowledged that other jurisdictions had eliminated flight instructions based on the theory that flight "often bears little, if any, relationship" to guilt, but nevertheless affirmed that "this state subscribes to the majority view approving the instruction under appropriate circumstances." 782 S.W.2d 490, 497, 498 (Tenn. Crim. App. 1989). More recently, in *State v. Dorantes*, the Tennessee Supreme Court approved an instruction on flight, noting that "'flight and attempts to evade arrest are relevant as circumstances from which, when considered with other facts and circumstances in evidence, a jury can properly draw an inference of guilt.'" 331 S.W.3d at 388 (quoting *State v. Zagorski,* 701 S.W.2d 808, 813 (Tenn. 1985)). The court noted that the defendant's departure from the country and subsequent complete disappearance

was "especially probative of guilt" and that "[a]ny inference of guilt by virtue of the defendant's departure from this jurisdiction was clearly warranted." *Dorantes*, 331 S.W.3d at 388. The Court reaffirmed that "Tennessee subscribes to the majority view among the states, which is to charge the jury regarding flight where appropriate." *Id.* at 388 n.16.

Here, the Defendant claims that his voluntary surrender subsequent to the flight warranted a charge allowing the jury to draw an inference of innocence. This court has previously rejected a similar argument in *State v. Richardson*, 995 S.W.2d 119, 128-29 (Tenn. Crim. App. 1998). In *Richardson*, the defendant remained hidden in the community for five days before voluntarily surrendering to police. *Id.* at 124. The defendant argued that public policy should not penalize those who surrender to police and that permitting a flight instruction after a voluntary surrender would be such a penalty. *Id.* at 129. This court found no error in the trial court's decision to give the flight instruction, concluding that the instruction properly left the determination of the existence of, motivation for, and importance of flight up to the jury. *Id.*; *see also State v. Wayne L. Holt*, No. M2001-00945-CCA-MR3-CD, 2002 WL 31465263, at *9 (Tenn. Crim. App. Nov. 5, 2002) (concluding that jury was properly instructed on flight when the defendant hid for three days but surrendered when he learned of arrest warrant and that any error would have been harmless). This court has also previously rejected claims that a "reverse flight" instruction is necessary when the accused chooses not to flee authorities. *State v. Weldon Christopher Frazier*, No. E2010-01822-CCA-R3-CD, 2012 WL 1996864, at *26-27 (Tenn. Crim. App. June 5, 2012) (noting that defendant was entitled to a presumption of innocence without the instruction); *State v. Thomas E. Chambers*, No. 03C01-9902-CR-00054, 1999 WL 1059969, at *4 (Tenn. Crim. App. Nov. 23, 1999) (concluding that defendant was "not entitled to an instruction that failure to flee is a factor to be considered in the defendant's favor").

The Defendant in this case dumped the victim's body down an embankment and apparently ran off the road as he left the scene. He then went home, saw his wife briefly, and left the state, later instructing his wife to report his truck stolen. He remained out of the state for several days, joined by his wife, who acknowledged using a false name when she and the Defendant stayed at a Kentucky motel. The Defendant voluntarily returned to the jurisdiction and met with Agent Wilkerson several days after the homicide. The members of the jury were aware of the circumstances of the Defendant's departure. They were also aware that he returned voluntarily. The instructions properly charged the law on flight, including that "the fact of flight alone does not allow you to find that the Defendant is guilty of the crime alleged" and that "an entirely innocent person may take flight and such flight may be explained by proof offered, or by the facts and circumstances of the case." We conclude that there was no error in the jury charge,

which properly consigned the determination of and inferences to be drawn from flight to the jury.

## C. Criminal Responsibility

The Defendant challenges the trial court's decision to instruct the jury on criminal responsibility. The Defendant alleges that the instruction was in error because he received no notice he would be prosecuted under the theory and because the theory was not fairly raised, as the evidence did not support a conclusion that, intending to promote or assist in the homicide, he aided his uncle in shooting the victim. The State responds that the theory was raised by the Defendant's theory of the evidence, that the proof supported the instruction, and that the evidence is sufficient to support a conviction. The State further asserts any error was harmless.

### 1. Notice

The Defendant initially objects to a lack of notice that the State would proceed under a theory of criminal responsibility. An indictment must put the accused on notice of the nature of the charge against him. *State v. Lemacks*, 996 S.W.2d 166, 172 (Tenn. 1999). Nevertheless, "[t]he theories available to support a conviction of [are] not required to be included in the indictment." *Id.*; *see also State v. James R. Lemacks*, No. 01C01-9605-CC-00227, 1997 WL 351140, at *3 (Tenn. Crim. App. June 26, 1997) (noting that because the State had no notice that the defense would present a theory that another person had been the driver, and because this defense was raised by the evidence at trial, "it was not improper to request the [criminal responsibility] charge at the conclusion of the proof"), *rev'd on other grounds by Lemacks,* 996 S.W.2d 166. A separate indictment charging criminal responsibility is not required when the indictment charges the defendant as the principal of the offense. *State v. Lemaricus Devall Davidson*, No. E2013-00394-SC-DDT-DD, __ S.W.3d __, 2016 WL 7339116, at *_ (Tenn. Dec. 19, 2016) (appendix). This is because an indictment on the principal offense "'carries with it all the nuances of the offense,' including criminal responsibility." *Lemacks*, 996 S.W.2d at 173 (quoting *State v. Johnson*, 910 S.W.2d 897, 900 (Tenn. Crim. App. 1995)). "[T]he State is not precluded from pursuing theories of criminal liability that are not mentioned in the bill of particulars, so long as such theories of liability do not exceed the scope of the indictment." *State v. Sherman*, 266 S.W.3d 395, 408 (Tenn. 2008). In *Sherman*, the State did not indicate in the bill of particulars that it would be pursuing a theory of criminal responsibility, but the Court found no error, concluding that the purpose of a bill of particulars "is not to lock the State into a specific theory of prosecution," and that a deviation from the bill of particulars requires the defendant to demonstrate prejudice in preparation of the defense. *Sherman*, 266 S.W.3d at 409. Neither is the State required to elect between prosecution as a principal or under

a theory of criminal responsibility. *State v. Hodges,* 7 S.W.3d 609, 625 (Tenn. Crim. App. 1998); *see also State v. Kenon Pack and Jennifer Banks*, No. W2014-00518-CCA-R3-CD, 2015 WL 3381223, at *7-8 (Tenn. Crim. App. May 26, 2015), *perm. app. denied* (Tenn. Sept. 21, 2015).

The Defendant was on notice that he was to be tried for the first degree premeditated murder of the victim. He was on notice of his own statement to his wife that his uncle was the shooter and that the shooting occurred after he, his uncle, and the victim struggled for a gun. The theory that the Defendant's uncle was the shooter was not introduced at trial until after the testimony of the last witness, the Defendant's wife, who had earlier absented herself during her scheduled testimony. Accordingly, we conclude that the State's request for the instruction at the close of proof was not error. *See James R. Lemacks*, 1997 WL 351140, at *3.

## 2. Criminal Responsibility Instruction

The Defendant also objects to the criminal responsibility instruction based on his assertion that there was no evidence to support a conclusion that he assisted his uncle in committing the crime. The accused may be convicted under a theory of criminal responsibility if, as applicable here, "[a]cting with intent to promote or assist the commission of the offense, or to benefit in the proceeds or results of the offense, the person solicits, directs, aids, or attempts to aid another person to commit the offense." T.C.A. § 39-11-402(2). "A person is criminally responsible as a party to an offense, if the offense is committed by the person's own conduct, by the conduct of another for which the person is criminally responsible, or by both." T.C.A. § 39-11-401(a). This statute "works in synergy with the charged offense to establish a defendant's guilt through the actions of another." *Sherman*, 266 S.W.3d at 408. Accordingly, persons convicted under a theory of criminal responsibility "are considered to be principal offenders, just as if they had committed the crime themselves." *Id.* A person who "aids or abets" the crime is guilty to "the same degree" as the principal offender. *Lemacks*, 996 S.W.2d at 171.

Criminal responsibility is "not a separate, distinct crime," but rather "a theory by which the State may prove the defendant's guilt of the alleged offense … based upon the conduct of another person." *Id.* at 170. The justification for the theory is that aiders and abettors should be held liable for the criminal acts of the principal actor which they intentionally facilitated or set in motion. *State v. Hatcher*, 310 S.W.3d 788, 811 (Tenn. 2010). The State must show that the defendant "'knowingly, voluntarily and with common intent unite[d] with the principal offender[ ] in the commission of the crime.'" *Id.* (quoting *Sherman*, 266 S.W.3d at 408). The accused must "'associate himself with the venture, act with knowledge that an offense is to be committed, and share in the

- 20 -

criminal intent of the principal in the first degree.'" *State v. Maxey*, 898 S.W.2d 756, 757 (Tenn. Crim. App. 1994) (quoting *Hembree v. State*, 546 S.W.2d 235, 239 (Tenn. Crim. App. 1976)). Presence and companionship with the perpetrator before and after the offense are circumstances from which participation may be inferred. *State v. Caldwell*, 80 S.W.3d 31, 38 (Tenn. Crim. App. 2002). The theory does not require physical participation in the crime; encouragement is sufficient. *State v. Little*, 402 S.W.3d 202, 217 (Tenn. 2013). Mere presence, however, is insufficient to support a conviction. *Id.*

A defendant can be prosecuted under a theory of criminal responsibility even when the principal is not prosecuted. *State v. Jameca M. Tipler*, No. W2014-00288-CCA-R3-CD, 2015 WL 721030, at *5 (Tenn. Crim. App. Feb. 19, 2015). The defendant in *State v. Gale Marleen Krizka* asserted that the evidence was insufficient to support a conviction under a theory of criminal responsibility because there was no evidence introduced regarding who, if anyone, was the principal criminal actor. No. E2007-02465-CCA-R3-CD, 2009 WL 856338, at *5 (Tenn. Crim. App. Mar. 26, 2009). This court rejected the argument, noting that the defendant's involvement was confirmed by the presence of the victim's blood on her carpet, walls, and furniture; that she had spoken of poisoning the victim or otherwise injuring him; that she had at one time asked another person to help her harm the victim; and that the defendant was so much smaller than the victim that it was unlikely she could have moved his body alone. *Id.*

A jury instruction on criminal responsibility should be given only when the "'issue is fairly raised by the evidence.'" *Little*, 402 S.W.3d at 217 (quoting *State v. Andrew L. Collins*, No. M2005-01685-CCA-R3-CD, 2006 WL 2380610, at *4 (Tenn. Crim. App. Aug. 15, 2006)). Furthermore, an instruction should only be given if the evidence would be sufficient to support a conviction under the theory. *See State v. Davis*, 266 S.W.3d 896, 903 (Tenn. 2008) (concluding that an instruction on lesser-included offenses is only required if the court determines both that the record contains evidence that reasonable minds could accept regarding the charge and that "evidence is legally sufficient to support a conviction for the lesser-included offense"). "'[I]f the evidence is insufficient to support an alternative legal theory of liability, it would generally be preferable for the court to give an instruction removing that theory from the jury's consideration.'" *Hatcher*, 310 S.W.3d at 812 (quoting *Griffin v. United States*, 502 U.S. 46, 60 (1991) and concluding that the trial court erred in giving instruction).

Evidence is sufficient to support a conviction where the proof establishes beyond a reasonable doubt that the accused was responsible for the crime, either as a principal offender or under a theory of criminal responsibility. *See, e.g., Little*, 402 S.W.3d at 217 (evidence sufficient to support conviction because even if the jury concluded that the defendant did not physically participate in crime, testimony established he was present and encouraged commission of the crime); *State v. Joshua Jones*, No. W2013-02119-

CCA-R3-CD, 2015 WL 832572, at *6 (Tenn. Crim. App. Feb. 25, 2015) (concluding that evidence was sufficient for conviction under a theory of criminal responsibility when the defendant approached the victim with a group of men and remained with the group throughout the brutal beating, even if he did not administer any blows); *State v. Justin Mathis*, No. W2005-02903-CCA-R3-CD, 2007 WL 2120190, at *12, *14 (Tenn. Crim. App. July 20, 2007) (upholding conviction when some evidence suggested that the defendant was the shooter and the remaining evidence, suggesting that the shooter was a passenger, supported a theory of criminal responsibility); *State v. Hodges*, 7 S.W.3d 609, 625 (Tenn. Crim. App. 1998) ("[T]he State need not elect between prosecution as a principal actor and prosecution for criminal responsibility in this case."); *State v. Charlie W. Dunn*, No. 88-241-III, 1990 WL 40988, at *3 (Tenn. Crim. App. Apr. 11, 1990) (concluding that jury did not have to find which defendant was the principal offender and which the aider because the evidence established that one or both of the appellants committed the crime and the other was criminally responsible).

In the case at bar, we must determine if the proof introduced at trial fairly raised issue of criminal responsibility. The State's proof tended to show that after spending the day with the victim apparently amicably, the Defendant procured a shotgun, shot the disabled victim in the back of the head, stripped him of his clothing before or after the crime, and dumped his body down an embankment. The State introduced proof that the victim was last seen as the Defendant drove him away in a white pickup truck. The Defendant's bloody pickup truck was discovered wrecked later that night, and the victim's body was located nearby the next day. The victim was killed by a shotgun wound to the back of the head which was not consistent with a struggle, and the victim's blood covered the bed of Defendant's truck and was also present inside the vehicle. The Defendant's fingerprints were in the blood, and his baseball cap was recovered nearby. The Defendant saw his wife but did not mention the crime, then fled the jurisdiction.

The Defendant's theory, that his uncle shot the victim, was supported by proof introduced through the Defendant's wife. Her testimony was that the Defendant told her that he and the victim went to the Defendant's uncle's house, that the Defendant's uncle became enraged when the victim made a sexual comment about the Defendant's four-year-old child, and that the Defendant's uncle then retrieved a shotgun and had a brief conversation with the victim in which the victim told him he "didn't have the nerve." The Defendant's wife testified that the three struggled over the gun after the Defendant's uncle put it to the victim's head. She also stated that the Defendant had told her that his uncle had the gun when it went off and that he did not have the gun.

We conclude that the issue was fairly raised by the evidence and that the evidence was sufficient to support a conviction. The Defendant's version of events was that his uncle held a gun on the victim, that the victim and Defendant's uncle struggled for the

gun, that the Defendant briefly joined the struggle, and that his uncle was holding the gun when it fired. The Defendant acknowledged that he participated in a struggle for the gun after his uncle put the gun to the victim's head. According to the Defendant, his uncle was prompted to get the gun by the victim's comment about the Defendant's son. The Defendant's uncle had a motivation to harm the victim based on the victim's alleged remarks about the Defendant's son. According to the Defendant's testimony, his uncle procured a weapon, loaded it, listened to the victim's comment that he "didn't have the nerve," and held it to the unarmed victim's head. The victim resisted at this point, and after a struggle, the gun discharged, killing the victim. The jury could have found that the Defendant's uncle was guilty of premeditated murder. *Bland*, 958 S.W.2d at 660 (factors which support a finding of premeditation are the use of a deadly weapon upon an unarmed victim and evidence of procurement of a weapon); *Adams*, 405 S.W.3d at 663 (establishing a motive for the killing may support a finding of premeditation). Further, the jury could have inferred that the Defendant was aiding his uncle based on the outcome of the struggle. The Defendant took no steps to report the crime, did not tell his wife that a shooting had occurred, and fled. The jury could have found that the Defendant had knowledge that the offense was about to be committed when his uncle retrieved and loaded the gun and pointed it at the victim's head, and that by joining in the struggle, he associated himself with the venture and shared in his uncle's criminal intent. *See Maxey,* 898 S.W.2d at 757. Accordingly, the instruction was proper and the evidence sufficient to support a conviction under a theory of criminal responsibility.

### D. Failure to Charge Facilitation as Lesser Included Offenses

The Defendant next objects to the failure to instruct the jury on facilitation. The Defendant asserts that, if the proof was sufficient to charge criminal responsibility under the theory that the Defendant's uncle was the shooter, the proof should also have supported an instruction that the Defendant facilitated his uncle's murder of the victim as a lesser included offense under that theory.

When a Defendant premises relief on the failure to instruct on a lesser-included offense, the request for the instruction must have been submitted to the trial court in writing. T.C.A. § 40-18-110(a) (Supp. 2010) ("When requested by a party in writing prior to the trial judge's instructions to the jury in a criminal case, the trial judge shall instruct the jury as to the law of each offense specifically identified in the request that is a lesser included offense of the offense charged in the indictment or presentment."). The court should only instruct on the lesser-included offense if the record contains evidence which could support a conviction on the offense. *Id.* Failure to request the instruction results in waiver:

Notwithstanding any other provision of law to the contrary, when the defendant fails to request the instruction of a lesser included offense as required by this section, the lesser included offense instruction is waived. Absent a written request, the failure of a trial judge to instruct the jury on any lesser included offense may not be presented as a ground for relief either in a motion for a new trial or on appeal.

T.C.A. § 40-18-110(c). The Defendant recognizes that this issue was waived in the trial court but requests plain error relief, noting that the theory of criminal responsibility was not raised until the close of proof.

For an error to constitute plain error sufficient to merit relief, the following factors must be present: (a) the record must clearly establish what occurred in the trial court; (b) a clear and unequivocal rule of law must have been breached; (c) a substantial right of the accused must have been adversely affected; (d) the accused did not waive the issue for tactical reasons; and (e) consideration of the error is necessary to do substantial justice. *State v. Bishop*, 431 S.W.3d 22, 44 (Tenn. 2014) (citing *State v. Adkisson*, 899 S.W.2d 626, 641-42 (Tenn. Crim. App. 1994)). Additionally, "'the plain error must be of such a great magnitude that it probably changed the outcome'" of the proceeding. *Id.* at 44 (quoting *Adkisson,* 899 S.W.2d at 642). "An error would have to especially egregious in nature, striking at the very heart of the fairness of the judicial proceeding, to rise to the level of plain error." *State v. Page*, 184 S.W.3d 223, 231 (Tenn. 2006). Erroneous failure to instruct on a lesser-included offense is subject to constitutional harmless error analysis. *State v. Ely,* 48 S.W.3d 710, 727 (Tenn. 2001). In evaluating harmless error, the court may consider the defendant's theory of the case, the verdict, and the evidence at trial. *State v. Brian Larice Cureton*, No. M2002-00835-CCA-R3-CD, 2003 WL 22303084, at *12 (Tenn. Crim. App. Oct. 8, 2003) (citing *State v. Allen,* 69 S.W.3d 181, 191 (Tenn. 2002)).

The Defendant asserts that, because the jury was charged with criminal responsibility under the theory that his uncle, acting with the Defendant's assistance, could have been the gunman, it should also have been charged with facilitation, which was supported by the same evidence.

A person is criminally responsible for the facilitation of a felony, if, knowing that another intends to commit a specific felony, but without the intent required for criminal responsibility under § 39-11-402(2), the person knowingly furnishes substantial assistance in the commission of the felony.

T.C.A. § 39-11-403(a). The distinction between facilitation and criminal responsibility is that a person guilty of facilitation has supplied substantial assistance to the principal

without the intent to promote, assist in, or benefit from the crime. *See State v. Fowler*, 23 S.W.3d 285, 287 (Tenn. 2000).

Facilitation is a lesser-included offense when a defendant is prosecuted under a theory of criminal responsibility. *Fowler*, 23 S.W.3d at 288; T.C.A. § 40-18-110(f)(1), (2). The duty to instruct on lesser-included offenses depends on the evidence introduced at trial, not on the theory of the parties. *State v. Jereco Tynes*, No. W2010-02511-CCA-R3CD, 2013 WL 1043202, at *18 (Tenn. Crim. App. Mar. 13, 2013) (citing *State v. Robinson,* 146 S.W.3d 469, 486 (Tenn. 2004)).

However, a trial court need not charge facilitation if the evidence could not support a conviction for the offense. *Page*, 184 S.W.3d at 228 (noting that a lesser-included offense need not be charged if the evidence is insufficient to support a conviction for the offense, and concluding there was no plain error in refusal to charge facilitation when the defendant failed to show the issue was not waived for tactical reasons); *Fowler*, 23 S.W.3d at 289 (concluding that "the evidence revealed two scenarios: criminal responsibility for [the principal offender's] conduct or an acquittal"); *State v. Teresa Deion Harris*, No. 02C01-9412-CC-00265, 1996 WL 654335, at *4 (Tenn. Crim. App. Nov. 12, 1996), (concluding there was no error in not charging facilitation on a record which contained evidence only of active participation in the crime and was "devoid of any evidence to support a conviction for criminal facilitation"). Accordingly, it is not reversible error to omit a facilitation charge when lesser culpability is not supported by the record. *See Jereco Tynes*, 2013 WL 1043202, at *18-19 (concluding there was no error in refusing to charge facilitation of attempted aggravated robbery or felony murder when the Defendant's statement established his intent to assist in the crime but finding reversible error in the failure to instruct on the facilitation of theft because the Defendant's statement could have established a lesser culpability); *State v. Tony Fason*, No. 02C01-9711-CR-00431, 1999 WL 588150, at *4 (Tenn. Crim. App. Aug. 6, 1999) (concluding that "failure to charge a lesser offense on a record clearly indicative of the greater offense and devoid of evidence permitting an inference of the lesser offense is not error").

However, a conviction should be reversed when the evidence supports a charge of facilitation and the State has not demonstrated that the error was harmless beyond a reasonable doubt. *State v. Michael Tyrone Gordon*, No. 01C01-9605-CR-00213, 1997 WL 578961, at *4-5 (Tenn. Crim. App. Sept. 18, 1997) (reversing because the proof could support a conclusion that the defendant knew about the robbery and assisted with the crime but without the intent required for criminal responsibility); *State v. Becky Davis*, No. 03C01-9701-CR-00027, 1998 WL 290236, at *10 (Tenn. Crim. App. May 1, 1998) (concluding that the evidence which supported the defendant's conviction as a principal or under a theory of criminal responsibility also could have supported a

conclusion that the defendant was only guilty of facilitation and reversing for failure to instruct); *State v. Reginald Merriweather*, No. W1999-02050-CCA-R3-CD, 2002 WL 1482742, at *14 (Tenn. Crim. App. Feb. 11, 2002) (concluding that it was reversible error not to charge facilitation and noting that error was not harmless because there are no intervening lesser-included offenses between an offense and its facilitation).

Improperly omitting a lesser-included offense instruction is a constitutional error of the same type and magnitude as improperly omitting an element of the offense. *Allen*, 69 S.W.3d at 190. When a lesser-included offense instruction is omitted but the jury has rejected an intervening offense, the error is harmless beyond a reasonable doubt. *State v. Williams*, 977 S.W.2d 101, 106 (Tenn. 1998). Because there is no intervening offense between facilitation and the principal offense, the *Williams* analysis does not apply. *Reginald Merriweather*, 2002 WL 1482742, at *14. Error in omitting an instruction may also be harmless beyond a reasonable doubt "[i]f no reasonable jury would have convicted the defendant of the uncharged lesser-included offense rather than the offense for which the defendant was convicted." *State v. Banks*, 271 S.W.3d 90, 126 (Tenn. 2008). A reviewing court examines the evidence presented at trial, the defendant's theory of the case, and the verdict. *Allen*, 69 S.W.3d at 191. In *State v. Locke*, the Tennessee Supreme Court concluded that omission of certain lesser-included offenses was harmless beyond a reasonable doubt because "the evidence was totally uncontroverted and overwhelming" that the greater offense had been committed, and no reasonable jury would have convicted on a lesser offense. *State v. Locke*, 90 S.W.3d 663, 675 (Tenn. 2002); *State v. Richmond*, 90 S.W.3d 648, 663 (Tenn. 2002) (concluding that error was harmless beyond a reasonable doubt when "uncontroverted and overwhelming evidence establishing the use of deadly weapons and [the defendant's] direct participation in the offenses"). The *Locke* court also concluded that omission of a facilitation charge was harmless beyond a reasonable doubt because the jury necessarily rejected a theory of facilitation for the underlying felony in rejecting a theory of facilitation in the felony murder conviction. *Id.* at 676 (reversing based on failure to instruct on lesser-included offenses of felony murder).

While we conclude that the proof that supported the charge of criminal responsibility could also lead a rational trier of fact to infer that the Defendant rendered his uncle aid in the killing but did not intend to promote the crime, we conclude that the Defendant has not established plain error in the failure to charge facilitation. The Defendant has failed to demonstrate that the issue was not waived as a tactical decision. Furthermore, plain error requires that a substantial right of the accused must have been adversely affected, but we conclude that the error in not charging facilitation was harmless beyond a reasonable doubt.

In evaluating the effect of error, we examine the Defendant's theory of the case, the verdict, and the evidence at trial. *Allen*, 69 S.W.3d at 191. The Defendant's theory of the case was that he did not assist his uncle to commit the offense in any way. Defense counsel argued in closing that "the struggle was [between] Robert Daniels and Greg King, not [the Defendant]." The prosecutor's closing argument also rejected the theory that the Defendant aided his uncle in committing the crime, calling the theory a "smoke screen," "inconceivable," and "not reasonable." The Defendant notes that the criminal responsibility charge was not raised until the close of proof and argues that the issue was therefore not waived for tactical reasons. However, the Defendant fought against the inclusion of the criminal responsibility charge, and his closing argument demonstrates that his theory of the case was to throw the blame for the offense on his uncle and paint himself as an innocent bystander who later helped to dispose of the corpse. Accordingly, it is not clear that the omission of the charge was not a tactical decision.

Furthermore, the strength of the proof that the Defendant was the principal offender weighs against finding that a substantial right of the Defendant was affected. *See Teresa Deion Harris*, 1996 WL 654335, at *4 (Tenn. Crim. App. Nov. 12, 1996) (record which was "replete with evidence to support the appellant's principal role in the crime" did not establish error in the refusal to charge facilitation). The proof in this case showed that the Defendant drove the victim, who was disabled, away from his home in a white truck wearing a baseball cap. The Defendant's white truck, covered in the victim's blood and bearing the Defendant's bloody fingerprints, was discovered wrecked later that night, and a baseball cap with DNA consistent with the Defendant's was located nearby. The victim's nude body was found near the truck the next day. The victim had died from a shotgun wound in the back of the head, and the medical examiner opined that the "wound pattern" could be caused by a struggle but that the wound and a struggle were "mutually exclusive." The night of the homicide, the Defendant returned to his wife and asked her to bandage a wound on his head. He did not say anything about witnessing a homicide. Instead, he left that night for Indiana, later asking his wife to report that his truck was stolen. He stayed in a hotel under a false name before turning himself in to authorities. The Defendant's version of events, that the victim was accidentally shot by his uncle in a struggle over a gun, did not account for the victim's nudity or the medical examiner's testimony that the wound was not consistent with a struggle. There was no showing of an error "'of such a great magnitude that it probably changed the outcome'" of the proceeding. *Bishop*, 431 S.W.3d at 44 (quoting *Adkisson*, 899 S.W.2d at 642). We conclude that the Defendant is not entitled to plain error relief.

## CONCLUSION

Based on the foregoing analysis, we affirm the judgments of the trial court.


_____
JOHN EVERETT WILLIAMS, JUDGE